T.C. Memo. 2011-238


UNITED STATES TAX COURT


BARRY S. FRIEDBERG AND CHARLOTTE MOSS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9530-09.                    Filed October 3, 2011.


<u>David J. Fischer</u> and <u>Kathleen Pakenham</u>, for petitioners.

<u>Marc Lee Caine</u>, <u>Rachel L. Schiffman</u>, and <u>Alex Shlivko</u>, for
respondent.


MEMORANDUM OPINION


WELLS, <u>Judge</u>:  The instant case is before the Court on the
parties' cross-motions for partial summary judgment pursuant to
Rule 121.[1]  Respondent determined a deficiency of $1,321,250 and

_____

    [1]Unless otherwise indicated, section references are to the
                                              (continued...)

a penalty pursuant to section 6662(h) of $528,500 with respect to petitioners' 2003 tax year.  The issues we must decide are:  (1) Whether the appraisal report regarding the donation of a conservation easement on historic residential property was a "qualified appraisal" within the meaning of section 1.170A-13(c)(3), Income Tax Regs.; (2) whether petitioners attached a fully completed appraisal summary of the appraisal report to their return, as required by section 1.170A-13(c)(2)(i)(B), Income Tax Regs.; (3) whether the purported transfer of unused development rights on the property was a valid transfer permitting petitioners to deduct the donation of the development rights pursuant to section 170(a) or whether the conservation easement otherwise restricted the use of the development rights; and (4) whether the donation of the conservation easement was granted in perpetuity, as required for a qualified conservation contribution pursuant to section 170(h).

### Background

The facts set forth below are based upon examination of the pleadings, moving papers, responses, and attachments. Petitioners are husband and wife (hereinafter referred to individually as Mr. Friedberg and Ms. Moss) who resided in New York at the time they filed their petition.

---

[1](...continued)
Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

The Subject Property

During 2002, Mr. Friedberg purchased a six-story residential townhouse in New York City on East 71st Street between Park Avenue and Lexington Avenue (the subject property) for $9,400,000. The subject property has never been subject to a mortgage during the time Mr. Friedberg has owned it. After Mr. Friedberg purchased the subject property, petitioners paid approximately $4 million to extensively renovate it. Ms. Moss is an interior designer, and after the renovation, House and Garden magazine published an article featuring her work on the subject property.

The subject property is in Manhattan's Upper East Side Historic District. It was constructed during 1884 in the Queen Anne style. On October 15, 2003, the National Park Service determined that the subject property "contributes to the significance of the * * * [Upper East Side Historic District] and is a 'certified historic structure' for a charitable contribution for conservation purposes in accordance with the Tax Treatment Extension Act of 1980." The subject property is not on a corner lot and is adjacent to two other properties on the same block of East 71st Street. Because of the length of the lot, it also abuts two properties on Lexington Avenue to the east and one property on East 70th Street to the south. All of those properties are also within the Upper East Side Historic District.

Solicitation From NAT

During 2003, the National Architectural Trust[2] (NAT) contacted Mr. Friedberg to ask him to donate an easement on the subject property.  Mr. Friedberg met with Sean Zalka (Mr. Zalka), a representative from NAT, to discuss donating a facade easement. After the meeting, Mr. Zalka sent Mr. Friedberg an email in which he wrote:

> Per our conversation, attached please find the following materials for your review:
>
> 1.  A revised profile of your estimated tax benefit, showing the additional tax benefits available for the extinguishment of the development rights on the site.  The sheet labeled 'Development Rights Retained' shows your estimated tax benefits using our standard easement document.  According to my calculations, your total tax deduction would increase to $3.5 million from $1.43 million.
>
> 2.  Additional language for insertion into our standard easement document to extinguish the development rights.  All or a portion of the development rights may be extinguished.
>
> As we discussed, the extinguishment of all or a portion of the additional development rights on a property such as yours (located within a 9 FAR zoning district) would provide an additional tax deduction of 100% of the value of those development rights.  Recent appraisals of development rights in the Upper East Side Historic District have come in at $150 to $170 per square foot.  With an estimated 13,800 square feet of development rights, you would receive an additional tax deduction of $2,070,000 (at $150 PSF).

---

[2]The National Architectural Trust has since changed its name to "Trust for Architectural Easements".

Per zoning regulations, you have the right to develop a building of 20,700 square feet on the above referenced site. However, local landmark regulations strictly limit your ability to do so. Although this footage is currently undevelopable given the location of the property within a landmark district, the IRS allows these deductions based on the perpetuity of the easement versus the local landmark restrictions, which are entirely discretionary and can be changed at any time (although this is highly unlikely).

We are currently working with a number of property owners to structure deductions of this kind. In order to substantiate these deductions, we recommend the use of a particular appraiser based in Pittsburgh who is the most highly respected in the specialty field of lost development rights appraisals. He would charge approximately $16,000 for a property of this kind (versus $2,500 for a standard appraisal). We would also need a zoning consultant to determine the exact amount of development rights that currently exist on the site.

Please let me know if you are interested in taking advantage of this aspect of our program.

Mr. Zalka attached a spreadsheet to his email that provided an estimate of the tax savings available to Mr. Friedberg should he decide to donate to NAT the facade easement and development rights for the subject property. Mr. Zalka's spreadsheet read as follows:

THE NATIONAL ARCHITECTURAL TRUST

Profile of Estimated Tax Benefit[1]

134 East 71st Street (Development Rights Extinguished)

| | |
|---|---|
| Estimated Fair Market Value | $ 13,000,000 |
| Conservation Easement Value (11% of FMV)[2] | $  1,430,000 |
| Estimated Development Rights Value | $  2,070,000 |
| (See Development Rights Analysis Worksheet) | |
| Total Estimated Gross Tax Deduction | $  3,500,000 |

| | | |
|---|---|---|
| Tax-Deductible Cash Donations (10% of Gross Tax Deduction) | $ | 350,000 |
| Appraisal | $ | 16,000 |
| Lender Subordination Fee (if applicable) | | |
| Total Estimated Tax-Deductible Costs | $ | 366,000 |
| Total Estimated Charitable Contribution Tax Deduction | $ | 3,866,000 |
| Total Estimated Federal, State and City Income Tax Savings (42.5% Tax Bracket) | $ | 1,643,050 |
| Total Estimated Cash Savings | $ | 1,277,050 |

[1]For illustrative purposes only.  Please consult your tax advisor.

[2]Actual figure determined by appraisal, typically 11% of FMV for comparable properties.

After reviewing NAT's materials, Mr. Friedberg decided to donate to NAT a facade easement and all the development rights associated with the subject property.

Mr. Ehrmann's Appraisal Report

Mr. Friedberg followed NAT's recommendation and engaged Michael Ehrmann (Mr. Ehrmann) of Jefferson & Lee Appraisals, Inc., based in Pittsburgh, to appraise the subject property. Mr. Friedberg paid $16,000 to Jefferson & Lee Appraisals, Inc., for the appraisal.  Mr. Ehrmann visited the subject property and conducted an inspection during November 2003.  Mr. Ehrmann prepared an appraisal report at some time after he had inspected the subject property.  The appraisal report states that the "as of" date was variously October 5, 2003; November 13, 2003; or November 15, 2003.  Mr. Ehrmann signed, but did not date, the

"certification of value" on page 3 of the appraisal report.  The cover letter accompanying the report is dated both December 5 and December 15, 2003, but Mr. Ehrmann did not sign or date the cover letter.  The appraisal report includes the address for Mr. Ehrmann's firm, Jefferson & Lee Appraisals, Inc., and it lists the address of the subject property.

The appraisal report states that it "has been prepared for tax purposes, in order to determine the loss of value due to a facade easement to be donated on the subject property."  The appraisal report includes a number of pages of background on the economic, social, cultural, environmental, and political forces that influence property values in New York City.  With regard to the effect of political forces, including local zoning laws, on property values, Mr. Ehrmann wrote:

> Property values are influenced by government, political and legal actions which effect [sic] the market forces of supply and demand.  * * *  The extent and nature of local zoning, building and health codes are also contributing factors to land use as it [sic] affects the value of real estate.  National, state and local fiscal policies affect property values and special legislation such as rent control laws, statutory redemption laws, forms of ownership, homestead exemption laws, environmental legislation and legislation affecting mortgage lending institutions may influence general property values.

On the basis of the lot's location in an R9X zoning district, permitting a "floor area ratio"[3] (FAR) of 9.0 for residential

---

[3]New York City's Zoning Resolution provides the following definition for "floor area ratio":

(continued...)

property, Mr. Ehrmann calculated that the lot had a maximum development potential of 20,786.94 square feet, approximately 13,731 square feet of which was unused.[4]  Mr. Ehrmann wrote:

> Although the underlying zoning would permit expansion of the subject property up to the maximum development potential, I believe that the New York City Landmarks Preservation Commission, which has authority over the Upper East Side Historical [sic] District, would block such an expansion.  However, the subject owner clearly has the right to transfer/see [sic] these development rights for use on neighboring blocks within the Historical District. Furthermore, I believe that developments utilizing Transferable Development Rights (TDR) would [be] feasible in this area, particularly along Lexington Avenue.

> New York statutes define transfer of development rights (TDR) as "the process by which development rights are transferred from one lot, parcel, or area of land in a sending district to another lot, parcel, or area of land in one or more receiving districts."  * * *

> In many TDR programs, the zoning provisions applicable to the sending district are amended to reduce the density at which land can be developed.  While losing their right to develop their properties at the formerly permitted densities, property owners in the sending district are awarded development rights.  These development rights are

---

[3](...continued)
"Floor area ratio" is the total floor area on a zoning lot, divided by the lot area of that zoning lot. If two or more buildings are located on the same zoning lot, the floor area ratio is the sum of their floor areas divided by the lot area. (For example, a zoning lot of 10,000 square feet with a building containing 20,000 square feet of floor area has a floor area ratio of 2.0, and a zoning lot of 20,000 square feet with two buildings containing a total of 40,000 square feet of floor area also has a floor area ratio of 2.0).

New York, N.Y., Zoning Resolution sec. 12-10 (2011).

[4]Respondent accepts those numbers as accurate for purposes of these motions.

regarded as severable from the land ownership and transferable by their owners.  * * *

The appraisal report then describes different aspects of transferable development rights programs in general, without any reference to the particular program implemented in New York City.

Mr. Ehrmann found that the "sales comparison approach" was the most appropriate valuation method for estimating the market value of the subject property before and after the donation.  He wrote:  "In the following sections of this report, I have estimated the market value of the subject property both before and after donation of the proposed easement utilizing the Sales Comparison Approach to value."  Mr. Ehrmann used the following sales to estimate the before value of the subject property:

| Date | Address | Sale Price | Square Feet | Price Per Square Foot | Adjusted $/Sq Ft | Historic District? |
|------|---------|-----------|-------------|----------------------|------------------|--------------------|
| 4/15/03 | 36 East 67th St | $9,750,000 | 16,235 | $1,216.51 | $1,655.80 | Yes |
| 3/26/03 | 631 Park Ave | 9,650,000 | 5,143 | 1,876.34 | 1,778.20 | Yes |
| 1/17/03 | 151 East 72d St | 8,187,500 | 5,885 | 1,391.25 | 1,701.13 | No |
| 1/15/03 | 123 East 73d St | 10,250,000 | 8,625 | 1,188.41 | 1,775.24 | Yes |
| 8/26/02 | 54 East 92d St | 9,000,000 | 4,320 | 2,083.33 | 2,595.79 | No |
| 6/17/02 | 10 East 87th St | 8,200,000 | 8,791 | 932.77 | 1,609.16 | No |
| 5/6/02 | 46 East 69th St | 10,250,000 | 8,500 | 1,205.88 | 1,755.77 | Yes |
| 2/16/02 | 20 East 73d St | 17,000,000 | 9,345 | 1,819.15 | 2,281.21 | Yes |
| 2/14/02 | 10 East 75th St | 8,250,000 | 8,930 | 923.85 | 1,527.13 | Yes |

Mr. Ehrmann adjusted those sale prices to take into account differences between those properties and the subject property due to the following factors:  Time of sale; location; condition of the property; size; and whether the property included a finished basement.  Although the properties were subject to different zoning, Mr. Ehrmann did not make any adjustments because, he

wrote: "I do not believe that the varying zones have an impact on subject value." After making all of his adjustments, Mr. Ehrmann averaged the adjusted prices and arrived at $1,853.27 per square foot, which he rounded to $1,855 and used as his estimate for the value of the subject property as of the appraisal date. On the basis of the subject property's gross floor area of 7,056 square feet, Mr. Ehrmann estimated that the subject property's total value was $13,090,000.

In addition to estimating the subject property's fair market value, Mr. Ehrmann sought to appraise the development rights that "could be transferred to a nearby property s [sic] as TDRs." To do so, he identified five transfers involving development rights on the east side of Manhattan. Three of the five transfers involved the sale of development rights by themselves; the other two involved the sale of an entire tract that included development rights previously acquired. Mr. Ehrmann calculated the price per FAR foot for each of the sales and then averaged those figures to reach an average of $154.40 per FAR foot. He then considered some general categories of adjustments, including time, location, size, zoning, and historic restrictions. With regard to historic restrictions, he wrote:

> The subject is part of the Upper East Side Historic
> District, with significant historic restrictions. None of
> the previous improvements on the comparable sites had a
> similar status. Furthermore, there do not appear to be
> historically protected properties in the immediate
> vicinities of the TDR comparables. As discussed previously,

the subject TDRs can only be utilized in a limited geographic area near the site. However, the TDRs transferred to the comparable properties do not appear to have had the same restriction.

I believe that the restrictions on the subject TDRs make these development rights somewhat less valuable than the apparently unrestricted rights purchased in the comparable transactions.

Mr. Ehrmann's comments reflect the fact that none of the other sales he considered was in a historic district. The average price per FAR foot of the comparable sales reported by Mr. Ehrmann was $154.40. However, Mr. Ehrmann estimated that the value of the unused development rights on the subject property was $170 per FAR foot. He explained his reasoning as follows:

I have identified five adjustment factors applicable to the TDR comparables. Three of the factors -- time, location, and size of the TDR -- support upward adjustments of a number of the comparable unit prices. The two other factors -- zoning and landmark limitations -- support downward adjustments of all of the comparable unit prices.

TDR transactions are complex. I have not made specific adjustments of each comparable for each adjustment factor discussed above. However, based on the overall adjustments, I estimate that the value of the TDRs on the subject property as of $170.00 per FAR foot.

Mr. Ehrmann calculated that the total value of the unused development rights associated with the subject property was $2,335,000. He then added that value to his before estimate of the value of the subject property to arrive at a total value for the subject property of $15,425,000.

The second half of the appraisal report provides an estimate of the value of the subject property after the facade easement.

In an introduction, Mr. Ehrmann explained that there are several reasons property values are negatively affected by facade easements.  One of the factors he listed was "the loss of the right to develop the property up to the maximum density allowed under the subject zone."  Other factors included potentially increased maintenance costs, loss of flexibility in changing exterior design, and the inability of future owners to use the tax advantages from an easement contribution.  Mr. Ehrmann noted:

> The best measure of the impact of these elements on property values is the market place [sic].  I have been able to identify a number of examples of the impact of easements on properties in both New Orleans and Washington, two cities where facade easements have been most actively used.

Mr. Ehrmann provided six examples of sales of eased properties in Washington, D.C., during the mid-1980s and two examples of transactions involving eased properties in New Orleans during the mid-1990s.

Mr. Ehrmann constructed the following table to summarize his research on comparable sales involving facade easements:

| Property # | Easement Loss |
|---|---|
| 1 | 27.9% |
| 2 | 18.3% |
| 3 | 8.9% |
| 4 | 18.6% |
| 5 | 22.5% |
| 6 | 8% |
| 7 | 30-40% increase in renovation costs |
| 8 | 11+% |

The average facade "easement loss" of the six sales of eased properties (i.e., properties 1 through 6, the Washington, D.C.,

sales) was 17.4 percent.  However, Mr. Ehrmann estimated that the facade easement on the subject property decreased its value by 11 percent.  He provided the following analysis to explain his reasoning:

> The comparable data shows estimated losses ranging from 8% to 27.9%.  The residential properties had losses ranging from 8% to 22.5%.  Most of the examples that I have identified took place during the 1980s, when the facade easement programs in both Washington and New Orleans were relatively new.  Comparables #7 and #8 are based on recent market developments.
>
> The subject property is a residential dwelling in excellent condition and degree of finish.  Based on the comparable data, with particular emphasis on Eased Property #8, I estimate that [the] facade easement will result in a loss of value of 11% of the value of the actual subject improvement before donation of the easement.

On the basis of his estimate of 11 percent, Mr. Ehrmann calculated that the facade easement would reduce the value of the subject property by $1,439,000, which he rounded to $1,440,000.  He stated that, after the easement, the unused development rights would have no value.  He therefore estimated that the "after" value of the subject property was $11,650,000.  Mr. Ehrmann concluded that the loss in value due to the facade easement was $3,775,000.[5]

---

[5]That figure reflects the value of both the facade easement and the development rights, but Mr. Ehrmann stated that it represented "the estimated market value of the loss due to the easement."

<u>The Donation</u>

On December 3, 2003, Mr. Friedberg executed a Conservation Deed of Easement (conservation deed). The conservation deed provided, in part:

II.

The Grantor does hereby grant and convey to the Grantee, TO HAVE AND TO HOLD, an easement in gross, in perpetuity, in, on, and to the Property, Building and to the Facade, being a Scenic, Open Space and Architectural Facade Conservation Easement on the Property, with the following rights:

A. Without the express written consent of the Grantee, which consent may be withheld, conditioned or delayed in the sole and absolute discretion of the Grantee, the Grantor will not undertake nor suffer nor permit to be undertaken with respect to that part of the Facade visible from the street-level on the opposite side of 134 E. 71st Street:

1. any alteration, construction or remodeling of existing improvements on the Property, or the placement thereon or on the Building of signs or markers, that would materially alter or change the appearance of the Facade;

2. the exterior extension of existing improvements on the Property or the erection of any new or additional improvements on the property or in the open space above or the erection of any new or additional improvements on the Property or in the open space above or surrounding the existing improvements except for, subject to the consent of the Grantee which consent will not be unreasonably withheld, the erection of new improvements, including an architecturally consistent Facade, to replace existing improvements which have been wholly or partially destroyed (e.g., by fire); or

3. the painting or cleaning of the Facade in a manner incompatible with the protection and preservation of the Facade * * *.

          *     *     *     *     *     *     *

D.  Grantor hereby agrees that the following acts or uses are expressly forbidden in, on, over, or under the Property, except as otherwise conditioned or permitted in writing by Grantee:  there shall be no use, exercise or transfer by Grantor or Grantee of development rights from or to the Property, any portion thereof or derived from any portion thereof.  For the purposes hereof, the term "development rights" includes, without limitation, any and all rights, however designated, now or hereafter associated with the Property or any other property that may be used, pursuant to applicable zoning laws or other governmental laws or regulations to compute permitted size, height, bulk or number of structures, development density, lot yield, or any similar development variable on or pertaining to the Property or any other property.  Both parties hereto recognize and agree that, subject to all other conditions of this Easement, all current and future development rights have been donated to the Grantee for the purposes of forever (i) removing such rights from the Property, (ii) extinguishing such rights, and (iii) further preventing the transfer or use of such rights.

*       *       *       *       *       *       *

IV.

A.  This easement is binding not only upon Grantor but also upon its successors, heirs and assigns and all other successors in interest to the Grantor, and shall continue as a servitude running in perpetuity with the land.  This easement shall survive any termination of the Grantor's or the Grantee's existence.  The rights of the Grantee under this instrument shall run for the benefit of and may be exercised by its successors and assigns, or by its designees duly authorized in a deed of easement.

B.  Grantor covenants that it will not transfer, assign or otherwise convey its rights under this conservation easement except to another "qualified organization" described in Section 170(h)(3) of the Internal Revenue Code of 1986 and controlling Treasury regulations, and Grantee further agrees that it will not transfer this easement unless the transferee first agrees to continue to carry out the conservation purposes for which the easement was created, provided, however, that nothing herein contained shall be construed to limit the Grantee's right to give its consent (e.g., to changes in the Facade) or to abandon some or all of its rights hereunder.

C. In the event this easement is ever extinguished, whether through condemnation, judicial decree or otherwise, Grantor agrees on behalf of itself, its heirs, successors and assigns, that Grantee, or its successors or assigns, will be entitled to receive upon the subsequent sale, exchange or involuntary conversion of the Property, a portion of the proceeds from such sale, exchange or conversion equal to the same proportion that the value of the initial easement donation bore to the entire value of the property at the time of donation as estimated by a state licensed appraiser, unless controlling state law provides that the Grantor is entitled to the full proceeds in such situations, without regard to the easement. Grantee agrees to use any proceeds so realized in a manner consistent with the conservation purposes of the original contribution.

The conservation deed was the only agreement between Mr. Friedberg and NAT. The conservation deed was recorded with the New York City Department of Finance, Office of the City Register.

By letter dated December 17, 2003, NAT acknowledged Mr. Friedberg's gift of a conservation easement on the subject property. That letter certified that no goods or services were received by Mr. Friedberg in exchange for his gift.

Procedural History

Petitioners timely filed their joint 2003 Federal income tax return. They deducted $3,775,000 for the donation of the facade easement and development rights on the subject property. Petitioners appended Form 8283, Noncash Charitable Contributions, signed by Mr. Ehrmann and by the president of NAT. It described the subject property by providing its address, and it described the condition of the subject property as "Historic Facade Conservation Easement". Petitioners did not provide information

on the Form 8283 about the date they acquired the subject property, how they acquired it, or their cost or adjusted basis in the subject property. The Form 8283 did not mention the donation of the development rights. The date of appraisal provided on the Form 8283 was November 15, 2003. Petitioners also attached to their tax return a copy of Mr. Ehrmann's appraisal report.

On or about January 23, 2009, respondent mailed to petitioners' last known address a statutory notice of deficiency. Petitioners timely filed their petition with this Court on April 20, 2009.

## Discussion

Rule 121(a) provides that either party may move for summary judgment upon all or any part of the legal issues in controversy. Full or partial summary judgment may be granted only if no genuine issue exists as to any material fact and the issues presented by the motion may be decided as a matter of law. See Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). As explained below, we conclude that we are able to resolve some of the issues presented on the basis of the undisputed facts contained in the parties' moving papers, including the attachments thereto.

I.   Whether the Appraisal Report Was a "Qualified Appraisal"

Section 170(a)(1) allows taxpayers to deduct charitable contributions only if those contributions are verified under regulations prescribed by the Secretary.  Those regulations require that a taxpayer claiming a noncash charitable contribution of more than $5,000:  (1) Obtain a qualified appraisal of the property contributed; (2) attach a fully completed appraisal summary (i.e., Form 8283) to the tax return on which the deduction is claimed; and (3) maintain records pertaining to the claimed contribution in accordance with section 1.170A-13(b)(2)(ii), Income Tax Regs.  Sec. 170A-13(c)(2), Income Tax Regs.  To constitute a qualified appraisal, the regulations require, among other things, that an appraisal be made not earlier than 60 days before the date of contribution of the appraised property nor later than the due date of the tax return on which a deduction is first claimed; be prepared, signed, and dated by a qualified appraiser; and include the following information:

   (A)  A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

   (B)  In the case of tangible property, the physical condition of the property;

   (C)  The date (or expected date) of contribution to the donee;

(D)  The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, * * *

       *       *       *       *       *       *       *

(E)  The name, address, and * * * identifying number of the qualified appraiser; and, if the qualified appraiser is acting in his or her capacity as * * * an employee of any person * * *, the name, address, and taxpayer identification number * * * of the * * * person who employs or engages the qualified appraiser;

(F)  The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G)  A statement that the appraisal was prepared for income tax purposes;

(H)  The date (or dates) on which the property was appraised;

(I)  The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J)  The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K)  The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Sec. 1.170A-13(c)(3)(ii), Income Tax Regs.  Those regulations were promulgated in response to Congress' mandate in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 155, 98 Stat. 691.  As we explained in Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), affd. without published opinion 166 F.3d 332 (4th

Cir. 1998), the primary purpose of DEFRA section 155 was to "provide a mechanism whereby respondent would obtain sufficient return information in support of the claimed valuation of charitable contributions of property to enable respondent to deal more effectively with the prevalent use of overvaluations."

Respondent contends that Mr. Ehrmann's appraisal report fails to meet the requirements of section 1.170A-13(c)(3)(ii)(C), (H), (I), (J), and (K), Income Tax Regs. With respect to subdivision (ii)(C), (H), and (I), respondent contends that the appraisal report is not a qualified appraisal because it does not contain the date of the contribution, is ambiguous as to the date the subject property was appraised, and does not value the subject property as of the date it was actually contributed. Petitioners contend that, although the appraisal report contains typographical errors with regard to dates, those errors are minor and the report substantially complies with subdivision(ii)(C), (H), and (I) of section 1.170A-13(c)(3), Income Tax Regs. Petitioners rely on our holding in Bond v. Commissioner, 100 T.C. 32, 41 (1993), in which we concluded that because the reporting requirements of section 1.170A-13, Income Tax Regs., did not "relate to the substance or essence of whether or not a charitable contribution was actually made" and because the taxpayers had satisfied all the elements required to establish the "substance or essence" of their contribution, the taxpayers

were entitled to the deduction claimed because they had "substantially complied" with the requirements of the regulations.

Similarly, in the instant case, the errors regarding the date of the appraisal report do not relate to the substance or essence of the contribution. Rather, the requirements relating the proper dating of the appraisal and contribution are more procedural. See Bond v. Commissioner, supra at 41; Dunavant v. Commissioner, 63 T.C. 316, 319-320 (1974) (noting that nonadherence to requirements that are "procedural and therefore directory" may sometimes be excused). Although there may be cases in which the failure to meet those requirements would be significant, the instant case is not such a case. We are persuaded that the discrepancies were merely typographical errors and that the report was completed within the 60-day period before the date of contribution, as required by section 1.170A-13(c)(3)(ii)(A), Income Tax Regs. Accordingly, we conclude that the appraisal report substantially complies with the requirements of subdivision (ii)(C), (H), and (I).

Additionally, respondent contends that the appraisal report does not meet the requirements of subdivision (ii)(J) and (K) because it fails to include the method and the specific basis for valuing the facade easement and the development rights. In general, the amount allowed as a charitable contribution

deduction is the fair market value of the contributed property. Sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value of a property is the price at which it would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. Because no established market exists for determining the fair market value of an easement, the "before and after" approach has often been applied to determine the fair market values of restrictive easements with respect to which charitable contribution deductions have been claimed. See, e.g., Hilborn v. Commissioner, 85 T.C. 677 (1985); Simmons v. Commissioner, T.C. Memo. 2009-208, affd. 646 F.3d 6 (D.C. Cir. 2011); Griffin v. Commissioner, T.C. Memo. 1989-130, affd. 911 F.2d 1124 (5th Cir. 1990). The before and after method operates by taking the difference between the value of the property immediately before the contribution and the value of the property immediately after. Hilborn v. Commissioner, supra at 689. An appraiser may use the comparable sales method, or another accepted method, to estimate the before and after values. Id.

An appraiser using the comparable sales method, also known as the market-data approach, locates sales of properties that meet three criteria: (1) The properties themselves are similar to the property being appraised; (2) the sales are arm's-length

transactions; and (3) the sales have occurred within a reasonable time of the valuation date. <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, 72 T.C. 1, 19 (1979). Because no two sales and no two properties are ever identical, the appraiser then considers aspects of the comparable transactions, such as time, size of the property, or other significant features, and makes appropriate adjustments for each to approximate the qualities of the property being appraised. <u>Estate of Spruill v. Commissioner</u>, 88 T.C. 1197, 1229 n.24 (1987); <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, <u>supra</u> at 19. Although the Court has accepted the use of the comparable sales method, we recognize that it, like all valuation techniques, is far from an exact science. <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, <u>supra</u> at 19.

The "before" value of the property considers the highest and best use of the property before its restriction by the easement. <u>Hilborn v. Commissioner</u>, <u>supra</u> at 689. If different from the current use, a proposed highest and best use requires "closeness in time" and "reasonable probability". <u>Id.</u> The highest and best use takes into account existing zoning or historic preservation laws that restrict the property's development potential even without a preservation easement. <u>Simmons v. Commissioner</u>, <u>supra</u>.

We have held that an explanation of the valuation method used and the specific basis for the appraised value are essential because "'Without any reasoned analysis, * * * [the appraiser's]

report is useless.'"  Friedman v. Commissioner, T.C. Memo. 2010-45 (quoting Jacobson v. Commissioner, T.C. Memo. 1999-401); Scheidelman v. Commissioner, T.C. Memo. 2010-151, on appeal (2d Cir., Sept. 2, 2010, Dec. 30, 2010).

Petitioners contend that Mr. Ehrmann used the comparable sales method to estimate the value of the subject property before and after Mr. Friedberg donated the facade easement and the development rights to NAT.  Indeed, Mr. Ehrmann stated in his appraisal report that he was applying the "Sales Comparison Approach".  For purposes of the instant motions, respondent does not contest the method Mr. Ehrmann used to arrive at the "before" value for the subject property, nor does respondent contest that value.[6]  Rather, respondent contends that Mr. Ehrmann failed to properly apply the comparable sales method to valuing the subject property after the facade easement, and respondent contends that Mr. Ehrmann failed to apply any acceptable method to valuing the development rights.  We will first consider respondent's contention with respect to the facade easement.

A.    Appraising the Facade Easement

Mr. Ehrmann's method for using comparable sales to estimate the before value of the subject property offers a textbook

---

[6]Respondent does not contest the "before" value Mr. Ehrmann estimated using comparable sales, but respondent does contest Mr. Ehrmann's appraisal of the development rights and his addition of that value to the "before" value.  See infra pp. 36-54.

example of how the comparable sales method works.  He located nine sales of similar properties that were close to the subject property in both time and geography.  He made a series of adjustments to the sale price of each property and explained in detail his rationale for making those adjustments.  Finally, after making the adjustments, he averaged the prices per square foot for all of the properties and used that average price per square foot to estimate the market value of the subject property before Mr. Friedberg donated the easement.

In contrast to his before valuation, Mr. Ehrmann's approach to valuing the subject property after the easement donation diverged significantly from the accepted comparable sales method. To properly apply the comparable sales method, Mr. Ehrmann should have located sales of similar properties in New York City with facade easements, made appropriate adjustments, and then used the average prices of those sales to estimate the after value of the subject property.  However, without explanation, Mr. Ehrmann elected to use sales of eased properties in Washington, D.C., and transactions related to eased properties in New Orleans to estimate the percentage diminution in value associated with facade easements in general.  Mr. Ehrmann then used the percentage diminution he purported to derive from those transactions and multiplied it by his estimated before value of the subject property to estimate the loss in value associated

with the facade easement.  That approach is not consistent with the comparable sales method Mr. Ehrmann claimed he was applying.

Not only did Mr. Ehrmann not actually use the comparable sales method or any other method the Court has sanctioned, but he also failed to consistently apply a single method to his estimates of percentage diminution, and the various methods he used were unreasonable.  To reasonably apply the method Mr. Ehrmann appeared to use, to which we will hereinafter refer as the percentage diminution method, Mr. Ehrmann would have needed to apply the comparable sales method to each of the Washington, D.C., and New Orleans properties he considered.  Instead, he applied a hodgepodge of approaches, most of which were unreasonable.

The first Washington, D.C., property Mr. Ehrmann considered was a mixed-use building with a gallery and two rental units.  It was purchased in 1982 for $350,000, underwent $80,000 of improvements, and was resold in September 1984 for $330,000.  Mr. Ehrmann's estimate, which was based on the amount invested in the property and on a survey showing that sale prices in the Dupont Circle neighborhood appreciated by a total of 6.5 percent during the period from 1981 to 1984, indicated that the easement decreased the property's value by 27.9 percent.

Mr. Ehrmann did not explain how the $80,000 was used to improve the property, nor why it was appropriate to simply add

$80,000 to the price of the property to estimate what it would have been worth without the easement. Without such an explanation, it was unreasonable for Mr. Ehrmann to assume that the $80,000 increased, dollar for dollar, the value of the property.[7] Moreover, it was unreasonable for Mr. Ehrmann to apply a 6.5-percent appreciation to the property on the grounds that the properties in the neighborhood appreciated by that amount over the course of 3 years, given that the owner held the property for only 2 years.

The second Washington, D.C., property was a residential building with two rental units that was sold during July 1985 for $237,000, or $69.71 per square foot. On the basis of the sale of a similar property on the same block for $85.29 per square foot during July 1984, Mr. Ehrmann estimated that the easement reduced the property's value by 18.3 percent.

Mr. Ehrmann's method of estimating the percentage diminution with regard to the second property can best be described as a very abbreviated comparable sales method. He found one other property that he considered similar, made no adjustments to the price of that property, and simply assumed that the eased

---

[7]It is conceivable that the $80,000 could have increased the value of the property by more than $80,000, that it could have increased it by less than that amount, or that it could even have decreased the value of the property. For instance, the owner could have spent $80,000 painting and decorating the house in a manner peculiar to his own aesthetic tastes but displeasing to most buyers.

property would have sold for the same price absent the easement. In contrast, the acceptable comparable sales method requires the examination of multiple similar properties and corresponding adjustments, accompanied by explanations. See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19. Mr. Ehrmann's shortcut was an unreasonable approach to estimating the percentage diminution of the eased property's value.

The third Washington, D.C., property Mr. Ehrmann considered was an owner-occupied home with a rental unit in the basement that sold for $610,000 during December 1986. The sale price included 3 months of free rent for the seller. Pursuant to the terms of an agreement with the buyer, the seller reduced the sale price and claimed the tax deduction for a facade easement on the house donated at about the same time as the sale. According to an appraisal of the property as of December 1986, the easement reduced the value of the property by 8.9 percent.

With regard to the third property, Mr. Ehrmann relied entirely upon another appraisal, about which nothing is set forth in his report. Without information regarding that appraiser's methods, experience, etc., it is impossible to review the reasonableness of the conclusion reached in that appraisal. We assume, therefore, that it was unreasonable for Mr. Ehrmann to rely on that appraisal as an estimate of the percentage diminution attributable to the facade easement.

Mr. Ehrmann's fourth Washington, D.C., property was a single-family house that sold for $215,000 during March 1985. On the basis of the sale for $255,000 of a slightly larger but otherwise "almost identical" home on the same block at around the same time, Mr. Ehrmann estimated that the easement decreased the value of the property by 18.6 percent.[8]

The approach Mr. Ehrmann used to estimate the percentage diminution in value of his fourth Washington, D.C., property is similar to the approach used with the second. It is unreliable for the same reasons we set forth above and for an additional reason: he did not make any attempt to adjust the sale price of the comparable property to reflect the fact that the eased property was smaller.

The fifth Washington, D.C., property was a two-unit, owner-occupied property sold for $127,400 during July 1985. Solely

---

[8]It is unclear how Mr. Ehrmann arrived at 18.6 percent. A reduction from $255,000 to $215,000 represents a decrease in value of 15.7 percent. According to Mr. Ehrmann's report, the $255,000 home was "slightly larger" than the home with the easement, which would presumably require a reduction in the sale price of $255,000 by some amount to reflect the fact that the eased home, being smaller, would have sold for less than the $255,000 home even without an easement. Mr. Ehrmann did not appear to make any such adjustment; any adjustment made would have corresponded to a decrease in value of less than 15.7 percent. We suspect that Mr. Ehrmann actually divided $40,000 (i.e., the difference between the $255,000 sale and the $215,000 sale) by $215,000 to arrive at his figure of 18.6 percent. That calculation was an error. When calculating the percentage reduction in value, the numerator should be the amount of the reduction and the denominator should be the "before" value, not the "after" value.

upon the basis of the original asking price of $159,000, Mr. Ehrmann estimated that the easement reduced the property's value by 22.5 percent.[9]

To reach his estimate of the percentage diminution in the value of the fifth property, Mr. Ehrmann made another unreasonable assumption:  that the asking price for the house was an accurate estimate of the value of the property before the easement.  We see no reason to believe that an asking price is an accurate measure of the value of a house, and Mr. Ehrmann has provided no reason to believe it was.

Mr. Ehrmann's sixth Washington, D.C., property was a single-family home with a separate English basement apartment that sold during July 1985 for $155,000, or $55.75 per square foot.  Five other properties were sold on neighboring blocks during the same period for $58.16 to $120.40 per square foot.  After making unexplained adjustments for "degree of finish and time of sale", Mr. Ehrmann concluded that "the data supports at least an 8% loss in value" due to the easement.

Mr. Ehrmann's method for estimating the percentage diminution in the value of the sixth property was the only method that resembled any reasonable method for estimating such a value.

---

[9]Even if we accept Mr. Ehrmann's logic, the reduction in value is only 19.9 percent, not 22.5 percent.  Mr. Ehrmann again erred by dividing the reduction in value by the "after" value of the property instead of the "before" value.

However, it was also flawed because Mr. Ehrmann provided no explanation for how he made adjustments to account for differences in degree of finish and time of sale. Given that the property was sold during 1985, it would have been very difficult for Mr. Ehrmann to have made reasonable adjustments for the differences in finish between neighboring properties since such adjustments would probably have been little better than guesswork.

The two other transactions Mr. Ehrmann considered were nonsale transactions on properties in New Orleans. Mr. Ehrmann reported that design changes mandated because of an easement on one residential property increased renovation costs by 35 to 40 percent. The easement on that property was granted during 1996, but Mr. Ehrmann's report provided no date for the renovation. The second New Orleans transaction was the settlement of a lawsuit filed by the 1994 purchasers of a property alleging that the sellers failed to disclose the existence of the facade easement. The case was settled out of court, and Mr. Ehrmann was not able to discover the exact amount of the settlement. However, he wrote that it "reportedly" exceeded 11 percent of the purchase price of the property. Mr. Ehrmann did not disclose the source from which he obtained the approximate amount of the settlement.

Because they were not sales, the transactions involving eased properties in New Orleans provide little insight about the effect of facade easements on the sales of eased properties.

Even setting aside the problems with Mr. Ehrmann's estimates of the percentage diminution in value for each of the above properties, the problems with his approach are manifold. Mr. Ehrmann provided no explanation for his conclusion that the properties in Washington, D.C., and New Orleans were comparable to the subject property in New York City. Indeed, those properties were very different. Most of the properties in Washington, D.C., included at least one rental unit, and one of the properties was even a multiunit rental property with a gallery on the first floor. Mr. Ehrmann himself discounted the utility of that property when, because it was a nonresidential property, he excluded it from his calculation of the average diminution. He provided no information about the facade easements to which the other properties were subject despite the fact that the provisions of such easements, depending upon how restrictive they were, might have resulted in different after values.

Additionally, Mr. Ehrmann failed to provide any rationale for comparing properties from cities other than New York City. Indeed, his use of properties from cities other than New York City appears inconsistent with reasoning from his appraisal

report, where he wrote that property values are influenced by local government actions and that the "extent and nature of local zoning, building and health codes are also contributing factors to * * * the value of real estate."

Similarly, the appraisal report provides no indication of why Mr. Ehrmann thought it appropriate to consider sales from the mid-1980s in his valuation of a donation made during 2003. Mr. Ehrmann himself cast doubt on the value of using sales from the mid-1980s when he placed more emphasis on the New Orleans transactions from the mid-1990s because, as he explained, those transactions "are based on recent market developments."

Accordingly, even if Mr. Ehrmann's percentage diminution method had been a reasonable means to estimate the after value of the subject property, Mr. Ehrmann's application of that method was so riddled with errors and unreasonable assumptions as to make his estimate of the subject property's after value worthless. Moreover, even Mr. Ehrmann's percentage diminution method, accepted at face value, does not substantiate the 11-percent diminution in value that his report concluded was appropriate to apply to the subject property. As noted above, the average percentage diminution for the six sale properties was 17.4 percent, not 11 percent.

Mr. Ehrmann chose to place "particular emphasis" on the eighth property instead of basing his estimated percentage

diminution on the average of all the properties he had considered.  However, the percentage diminution he reached for his eighth property (a New Orleans property) was not even based on the sale of an eased property.  Instead, it was based on the settlement amount stemming from a lawsuit filed by a purchaser against a seller because the seller had not disclosed the existence of a facade easement on the sale property.  Mr. Ehrmann provided no explanation of why he considered the amount of the settlement to accurately establish how much the easement had affected the value of the property, and we find such an assumption unreasonable.[10]  Worse, Mr. Ehrmann was not even sure about the actual amount of the settlement.  Instead, he wrote that it "reportedly" exceeded 11 percent of the purchase price.

In other words, it appears that Mr. Ehrmann's estimate for the effect of a facade easement granted during 2003 on the value

---

[10]Given that the suit was brought after the purchasers had begun to renovate the home, had been enjoined from conducting those renovations by the holder of the easement, and had subsequently reached an agreement with the easement holder to complete modified renovations, it is likely that the settlement amount also took into account damages to the purchaser resulting from that suit, from increased costs of required changes to the renovation work, and from any contract claims that may have arisen from being forced to change renovation plans.  Suffice it to say that the purchaser's claims probably were considerably more complex than simply the diminution in value of the property resulting from the easement.  Moreover, even if the purchaser's claims had been related only to the diminution in value, there is no reason to believe that the settlement amount would have been an accurate indication of how much the easement affected the value of the property.

of the subject property in New York City was actually based upon a rumor about a settlement agreement reached during the mid-1990s of a lawsuit filed against a seller for failing to disclose the existence of a facade easement on a property in New Orleans.

Petitioners contend that the very inclusion of comparable sales, regardless of how reasonable the use of those comparable sales was, indicates compliance with the regulatory requirements of a qualified appraisal. We disagree. Nothing in Mr. Ehrmann's report supports his conclusion about the after value of the subject property. Indeed, it appears that Mr. Ehrmann arrived at 11 percent, the percentage of fair market value that NAT had told Mr. Friedberg was typical for facade easements, in spite of his research on comparable sales and not because of it. We note that we previously have held that the mechanical application of a percentage diminution to the fair market value before donation of a facade easement does not constitute a method of valuation as contemplated under section 1.170A-13(c)(3)(ii), Income Tax Regs. See Scheidelman v. Commissioner, T.C. Memo. 2010-151; see also 1982 East, LLC v. Commissioner, T.C. Memo. 2011-84. We similarly conclude that Mr. Ehrmann's appraisal report was not a qualified appraisal with respect to its valuation of the facade easement.

Unlike the requirements of section 1.170A-13(c)(3)(ii)(C), (H), and (I), Income Tax Regs., the requirements of subdivision (ii)(J) and (K) do relate to the substance or essence of the

contribution and the substantial compliance doctrine therefore does not apply. See <u>Scheidelman v. Commissioner</u>, <u>supra</u>. As we explained in <u>Scheidelman</u>: "the lack of a recognized methodology or specific basis for the calculated after-donation value is too significant for us to ignore under the guise of substantial compliance." <u>Id.</u> Accordingly, because petitioners did not submit a qualified appraisal, they are not entitled to the claimed deduction for the facade easement. See <u>Hewitt v. Commissioner</u>, 109 T.C. 258 (1997); <u>Scheidelman v. Commissioner</u>, <u>supra</u>.

B. <u>Appraising the Development Rights</u>

We now consider whether Mr. Ehrmann's appraisal report constituted a qualified appraisal with respect to the development rights. We begin by examining the nature of the development rights in issue.

1. <u>Transferring Development Rights in New York City</u>

The transferability of the development rights in issue in the instant case is governed by New York City's Zoning Resolution.[11] Pursuant to the Zoning Resolution, lot owners are

---

[11]The concept of development rights stems from restrictions on the use of "air rights", the rights to construct a building on top of the owner's land. Air rights are rooted in the bundle of rights associated with land ownership. The New York Court of Appeals has explained the concept of air rights as follows:

[A]ir rights, at the heart of the concept of zoning lot merger, have historically been conceived as one of the

(continued...)

not permitted to construct buildings larger than a certain bulk, determined by multiplying the lot's area by the FAR established for the lot by the Zoning Resolution.  New York, N.Y., Zoning Resolution sec. 12-10 (2011).  For example, the owner of a 10,000-square-foot lot with an FAR of 10 would not be allowed to construct a building with a floor area of more than 100,000 square feet.  The Zoning Resolution defines many different zoning districts, which permit development in varying degrees.  See New York, N.Y., Zoning Resolution secs. 11-122 (creating zoning districts), 23-00 to 24-68 (laying out bulk restrictions for residential districts), 33-00 to 35-63 (laying out bulk restrictions for commercial districts), 43-00 to 43-61 (laying

---

[11](...continued)
bundle of rights associated with ownership of the land rather than with ownership of the structures erected on the land.  Air rights are incident to the ownership of the surface property -- the right of one who owns the land to utilize the space above it.  This right has been recognized as an inherent attribute of the ownership of land since the earliest times as reflected in the maxim, "[cujus] est solum, ejus est usque ad coelum et ad inferos" ["to whomsoever the soil belongs, he owns also to the sky and to the depths"].

Macmillan, Inc. v. CF Lex Associates, 437 N.E.2d 1134, 1137 (N.Y. 1982) (internal citations omitted).  However, the Zoning Resolution limits the use of those air rights and gives property owners the limited ability to transfer those air rights.  New York City enacted the original Zoning Resolution during 1916 in response to concerns about the shadows cast by newly constructed skyscrapers.  See Note, "Development Rights Transfer in New York City", 82 Yale L.J. 338 (1972).  Because the original height and setback limitations proved insufficient to constrain crowding growth, the Zoning Resolution was amended during 1961 to incorporate FAR limitations.  See id. at 344-348.

out bulk restrictions for manufacturing districts).  The zoning designation and attendant development rights assigned to a parcel depend on factors such as neighborhood character, access to public transportation, and street width.  Marcus, "Air Rights in New York City: TDR, Zoning Lot Merger and the Well-Considered Plan", 50 Brook. L. Rev. 867, 869 (1984).

For the most part, rights to develop the lots are stationary and may not be transferred to other lots, but the Zoning Resolution provides several means by which the owner of one lot may transfer some of the unused development rights associated with that lot to another.  See New York, N.Y., Zoning Resolution secs. 12-10 (defining zoning lot and explaining merged zoning lots), 74-79 (transfer of development rights from landmark sites); see also Landis et al., "Transferring Development Rights in New York City", N.Y.L.J., Sept. 29, 2008; Marcus, supra; Selver & Sillerman, "Transfers of Development Rights: What's New -- And What Is Not", N.Y.L.J., Aug. 24, 2009.  The amount of unused development rights associated with a given lot is the difference between the actual floor area of the building constructed on the lot and the maximum floor area that would be permitted for that lot under the Zoning Resolution.

When New York City's Zoning Resolution was first amended to incorporate FAR limitations during 1961, it permitted only one means of transferring unused development rights:  property owners

were allowed to transfer those unused development rights to adjacent properties on the same block via a zoning lot merger. Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 113-114 (1978); Marcus, supra at 870-874. During 1968, a new ordinance was enacted that gave additional transfer opportunities to owners of properties that the Landmarks Preservation Commission had designated landmarks.[12] Penn Central Transp. Co. v. City of New York, supra at 114. Under that ordinance, unused development rights could be transferred from landmark sites to properties across the street or across an intersection. Id. During 1969, another amendment further increased options for transferring development rights in certain commercial districts.[13] Id. Under the new amendment, development rights from a landmark could be transferred to any lot in a chain of contiguous properties under common ownership, as long as part of

---

[12]During 1965, in response to concerns about the destruction of buildings with significant historical, architectural, and cultural value, New York City adopted its Landmarks Preservation Law. Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 108-109 (1978); see N.Y. City Admin. Code, ch. 25, sec. 303. The task of administering the law was given to the Landmarks Preservation Commission. Penn Central Transp. Co. v. City of New York, supra at 110; see New York City Charter ch. 74, sec. 3020. The Landmarks Preservation Commission was given the power to designate landmarks, interior landmarks, and historic districts. N.Y. City Admin. Code ch. 25, sec. 303(a).

[13]The 1968 and 1969 amendments were enacted to ensure that the owners of Grand Central Terminal would have options to sell their unused development rights. Penn Central Transp. Co. v. City of New York, supra at 114.

the chain was contiguous to or across the street from the landmark site.  Id.  A chain of common ownership could extend across streets or intersections.  Id.; see New York, N.Y., Zoning Resolution secs. 74-79 to 74-793.[14]  Aside from special transfer rights granted to certain districts,[15] zoning lot mergers and

---

[14]Zoning Resolution sec. 74-79 provides:

In all districts except R1, R2, R3, R4 or R5 Districts or C1 or C2 Districts mapped within such districts, for developments or enlargements, the City Planning Commission may permit development rights to be transferred to adjacent lots from lots occupied by landmark buildings * * *

* * * * * * *

For the purposes of this Section, the term "adjacent lot" shall mean a lot that is contiguous to the lot occupied by the landmark building or other structure or one that is across a street and opposite to the lot occupied by the landmark building or other structure, or, in the case of a corner lot, one that fronts on the same street intersection as the lot occupied by the landmark building or other structure.  It shall also mean, in the case of lots located in C5-3, C5-5, C6-6, C6-7 or C6-9 Districts, a lot contiguous or one that is across a street and opposite to another lot or lots that except for the intervention of streets or street intersections, form a series extending to the lot occupied by the landmark building or other structure.  All such lots shall be in the same ownership.

[15]Two such special districts are the Special South Street Seaport District and the Theater Subdistrict.  The Special South Street Seaport District was created during 1972, and it allowed excess development rights from certain lots in the core of the district to be transferred to designated "receiving lots" near the periphery of the district.  Peck Slip Associates, LLC v. City Council of New York, 789 N.Y.S.2d 806, 809 (Sup. Ct. 2004); see New York, N.Y., Zoning Resolution, secs. 91-60 to -69.  During 1998, the Zoning Resolution was amended to authorize the transfer of development rights from "listed theaters" to receiving sites anywhere within the Theater Subdistrict.  Fisher v. Giuliani, 720
(continued...)

transfers from landmarks to adjacent properties linked by a chain of common ownership remain the only means by which property owners may transfer their unused development rights. See Fisher v. Giuliani, 720 N.Y.S.2d 50, 52 (App. Div. 2001); see also Kruse, "Constructing the Special Theater Subdistrict: Culture, Politics, and Economics in the Creation of Transferable Development Rights", 40 Urb. Law. 95, 115-119 (2008).

### 2. Mr. Friedberg's Ability To Transfer the Unused Development Rights

The parties disagree about whether Mr. Friedberg could transfer the unused development rights. As we explained above, with the exception of properties in a few specially designated districts, there are only two means by which a property owner can transfer unused development rights: (1) Through a zoning lot merger, or (2) through the sale of unused development rights to a property linked to that property by a chain of common ownership. However, the second option is available only to owners of properties that have been designated landmarks by the Landmarks Preservation Commission. See New York, N.Y., Zoning Resolution sec. 74-79. Respondent contends that because the subject property has not been designated a landmark, Mr. Friedberg's options for transferring the unused development rights are

---

[15](...continued)
N.Y.S.2d 50, 52 (App. Div. 2001); see New York, N.Y., Zoning Resolution sec. 81-744.

limited to the first option.  Petitioners do not squarely address respondent's argument because petitioners failed to identify the relevant law governing the transfer of development rights in New York City.

Petitioners premise their arguments regarding the sale of their development rights on the 1989 New York State law that authorizes cities to set up transferable development rights programs.  See N.Y. Gen. City Law sec. 20-f (McKinney 2003). That law provides:

> 2.  In addition to existing powers and authorities to regulate by planning or zoning including authorization to provide for transfer of development rights pursuant to other enabling law, the legislative body of any city is hereby empowered to provide for transfer of development rights subject to the conditions hereinafter set forth and such other conditions as the city legislative body deems necessary and appropriate that are consistent with the purposes of this section, except that in cities of over one million any transfer of development rights shall be provided in the zoning ordinance after adoption by the city planning commission and board of estimate.  * * *

> *     *     *     *     *     *     *

> 4.  Nothing in this section shall be construed to invalidate any provision for the transfer of development rights heretofore or hereafter developed by any local legislative body, or, in the case of cities over one million, by the board of estimate.

Id. As the State law makes clear, it was not intended to invalidate or supplant any existing transferable development rights program.  Indeed, the law's only effect is to enable local governments to enact transferable development rights programs similar to the one already adopted by New York City.  New York

City's Zoning Resolution, already in place well before the State enacted New York General City Law section 20-f, remains the law governing the transfer of development rights in New York City.

As noted above, New York City's Zoning Resolution generally permits development rights transfers only via zoning lot mergers and from "lots occupied by landmark buildings or other structures". New York, N.Y., Zoning Resolution secs. 12-10, 74-79. Section 74-79 of the Zoning Resolution stipulates that a "landmark building or other structure shall include any structure designated as a landmark by the Landmarks Preservation Commission and the Board of Estimate". It also expressly states that it does not permit the transfer of development rights from structures within historic districts: "No transfer of development rights is permitted pursuant to this Section from those portions of zoning lots used for cemetery purposes, any structures within historic districts, statues, monuments or bridges."[16]   Id.

---

[16]During 1970, city planners floated a proposal that would have allowed owners of smaller midblock townhouses on the Upper East Side's cross-streets to transfer their unused development rights to developers building high-rise buildings fronting the avenues. Note, "Development Rights Transfer in New York City", 82 Yale L.J. at 361-362. However, the plan met strong resistance from neighborhood residents and was defeated. Id. at 362. Critics feared that such a plan would change the character of the neighborhood, endanger light to the midblock areas, and overburden the neighborhood's already crowded subway line. Id. at 365-367.

Accordingly, Mr. Friedberg's options for transferring the unused development rights from the subject property were quite limited. Because his property was not a designated landmark, his only option for transferring his unused development rights was via a zoning lot merger. Given that all of the adjacent lots were also within the boundaries of the Upper East Side Historic District, owners of those properties were unlikely to be able to use the unused development rights because any alteration of those buildings would have required approval by the Landmarks Preservation Commission, which must approve all alterations of buildings within historic districts. See N.Y. City Admin. Code, ch. 25, sec. 305(a)(1). However, we cannot conclude, as a matter of law, that Mr. Friedberg was unable to transfer or otherwise use the development rights. Although any use of those development rights would have been subject to the review of the Landmarks Preservation Commission, it is not certain that the Landmarks Preservation Commission would have blocked all use of the development rights. Rather, whether the development rights could have been used is a disputed issue of material fact. Accordingly, that issue is not ripe for summary judgment.

### 3. The Market for Development Rights

Because of New York City's restrictions on transferring development rights, the value of the development rights associated with any given property is highly variable. Whether

- 45 -

those development rights have any value depends upon the demand for development rights in the immediate vicinity of the property. The New York Court of Appeals has described the difficulties of selling development rights:

> By compelling the owner to enter an unpredictable real estate market to find a suitable receiving lot for the rights, or a purchaser who would then share the same interest in using additional development rights, the amendment renders uncertain and thus severely impairs the value of the development rights before they were severed.

Fred F. French Investing Co., Inc. v. City of New York, 350 N.E.2d 381, 388 (N.Y. 1976). At least one New York court has refused to allow a condemnation award with regard to the unused development rights attached to a property because valuing those rights was "too speculative". See In re New York State Urban Dev. Corp., 765 N.Y.S.2d 239, 239 (App. Div. 2003). That court considered whether there was any probability that those development rights would have been used in the reasonably near future. Id. This Court has similarly required that, when considering the highest and best use of property, only those uses that are reasonably likely in the near future should be considered. Hilborn v. Commissioner, 85 T.C. at 689.

Respondent contends that Mr. Ehrmann's report fails to address the probability that the unused development rights attached to the subject property would be purchased in the near future. Respondent contends that without such an assessment, the appraisal report is not a qualified appraisal. Petitioners

contend that the Court may consider such issues in deciding how much weight to accord the appraisal report but that those issues are irrelevant to deciding whether the appraisal report counts as a qualified appraisal.

The market for unused development rights in the immediate vicinity of the subject property is an important factor in determining the market price of those rights, and Mr. Ehrmann's report acknowledged that the subject property's location would influence the demand for those rights. He made a downward adjustment in his estimate of the price for the development rights to account for the subject property's location in a historic district, but he did not explain in any detail how he estimated the appropriate adjustment or arrived at his conclusion regarding the market demand for the development rights. Whether his report adequately assessed the market demand for those rights is a disputed issue of material fact that we will not decide on the parties' motions for partial summary judgment.

4. <u>Mr. Ehrmann's Appraisal of the Development Rights</u>

Respondent contends that Mr. Ehrmann's appraisal of the development rights was not a qualified appraisal within the meaning of section 1.170A-13(c)(3)(ii), Income Tax Regs., and that we should therefore sustain respondent's disallowance of petitioners' deduction for the donation of those rights. In his appraisal report, Mr. Ehrmann sought to estimate a value for the

unused development rights associated with the subject property.
To do so, he located five transactions involving properties near
the subject property where development rights had been purchased
from neighboring properties. However, his method of using those
comparable transactions to estimate the value of the unused
development rights on the subject property was inconsistent. In
several cases, it contained mathematical errors and erroneous
assumptions.

With regard to two of the transactions he considered
comparable, Mr. Ehrmann erred by using the price per square foot
of the development rights already attached to the land instead of
the price per square foot of the additional development rights
purchased. For instance, his second comparable transaction
consisted of the purchase of a parcel, a purchase of development
rights from an adjacent parcel, and the purchase of additional
development rights from inclusionary housing bonuses.[17] The
parcel, which had an FAR of 13.04 and a land area of 8,434 square
feet, was purchased for $25.1 million. The price per square foot
for the floor area associated with the parcel was therefore
$228.22. In addition, the purchaser paid $1.08 million for 9,000
square feet of development rights and $2.04 million for 17,000

_____

[17]New York City's Inclusionary Housing Program grants
"bonus" floor area in exchange for the creation or preservation
of affordable housing units for low-income households. See New
York, N.Y., Zoning Resolution secs. 23-90 to -962.

square feet of inclusionary housing bonus floor area. The prices per square foot for the development rights and the inclusionary housing bonuses were both $120 per square foot. However, Mr. Ehrmann reported that the price per square foot for the entire transaction was $228.36, which was actually the price per square foot of the development rights attached to the parcel, not the price per square foot for the additional floor area.[18] Mr. Ehrmann erred when he used $228.36. The comparable part of the transaction was the purchase of the additional floor area, the price for which was $120 per square foot.

Mr. Ehrmann made a similar error with regard to his fourth comparable transaction. That transaction included a land area of 11,815 square feet with an FAR of 18.1, plus an additional 78,496 square feet of development rights previously acquired from adjacent parcels. Although it is unclear how Mr. Ehrmann arrived at a price per square foot of $101.27, it appears that he calculated that price by dividing the total price of the building, after it had been constructed using additional development rights, by the development rights that came with the parcel.[19] In other words, his calculation completely ignored the

---

[18]We presume Mr. Ehrmann meant to use the price per square foot for floor area associated with the parcel, which we calculate to be $228.22 but that his calculation was off because of a minor rounding or transcription error.

[19]Carrying out that calculation yields a price per square
(continued...)

development rights acquired from adjacent parcels.  That number is clearly an inaccurate measure of the price per square foot of the development rights.

Mr. Ehrmann made a different error with regard to his first comparable transaction.  The building's zoning permitted an FAR of 10.0 with a land area of 10,070 square feet, and the building had acquired additional development rights from adjacent parcels of 50,913 square feet and 40,272 square feet from inclusionary housing bonuses.  The building therefore had a total of 191,885 square feet available.  Mr. Ehrmann reported that the price per square foot was $119.86.  It is unclear whether Mr. Ehrmann understood what his reported price per square foot actually represented because he wrote that the price per square foot "noted above is applicable to the additional development rights". Reproducing Mr. Ehrmann's calculation shows that the reported price per square foot was actually the average price per square foot for the entire building, not just the additional development rights.  That calculation assumes the same price per square foot for both the original parcel and the additional development rights.  Without further explanation, such an assumption is unrealistic.  For instance, in his second comparable transaction,

---

[19](...continued)
foot of $102.21, close to Mr. Ehrmann's $101.27.  We assume the numbers are slightly off because of rounding or transcription errors made by Mr. Ehrmann.

there was more than a $100-per-square-foot difference between the price per square foot for the additional development rights and that for the rights associated with the original parcel.[20]

The fifth comparable considered by Mr. Ehrmann was actually two separate purchases of development rights from two different sites:  One purchase of 24,000 square feet for $104.17 per square foot and one purchase of 16,216 square feet for $291.13 per square foot.  Both of those purchases were used to develop one property.  Both sales would seem to be comparable to the type of sale Mr. Ehrmann claims Mr. Friedberg would have been able to make with the unused development rights on the subject property.  Inexplicably, instead of using each of the two sales as an individual comparable, Mr. Ehrmann combined them and used their weighted average of $179.83 as his fifth comparable sale.[21]  Such a calculation makes little sense.[22]

-----

[20]The reason the price per square foot for the development rights associated with the land parcel will usually be higher than the price per square foot for the additional development rights is that the development rights associated with the land parcel include the land itself, and the land is necessary to actually build anything.  The purchased development rights, also known as "air rights", only allow the purchaser to build a bigger building on the land already owned.

[21]The weighted average is actually $179.56 per FAR foot.  We assume Mr. Ehrmann's figure is different because of minor rounding or transcription errors.

[22]Assuming that those sales were comparable to the hypothetical sale of the unused development rights associated with the subject property, Mr. Ehrmann should have simply used

(continued...)

Only Mr. Ehrmann's third comparable provided a reasonable estimate of what development rights might sell for in the neighborhood of the subject property. His third comparable was the sale of 42,048 square feet of development rights for $6 million, or $142.69 per square foot.

Using Mr. Ehrmann's numbers, he arrived at an average price per square foot of $154.40. He then discussed general adjustments relating to time, location, number of square feet of floor area, zoning, and landmark limitations. He did not specifically describe those adjustments but concluded that the price per square foot of the unused development rights on the subject property was $170 per square foot. Mr. Ehrmann multiplied $170 by the amount of the unused development rights he calculated for the subject property. That calculation gave him a total value of $2,335,000.

Inexplicably, Mr. Ehrmann then added that amount to his previously estimated before value of the subject property. He did not explain why it was proper to do so. Unless all of the comparable properties Mr. Ehrmann used to estimate a before value for the subject property had zero unused development rights, a

_____

[22](...continued)
the price per square foot of each of them as a separate comparable transaction. It was an error to average them. If Mr. Ehrmann had been using the sales as separate comparable transactions, it would also have been inappropriate for him to calculate a weighted average.

proposition that seems highly unlikely, the value of the unused

development rights would already have been reflected in the

market prices for those properties.  Therefore, Mr. Ehrmann's

estimate of the before value for the subject property, which was

based on the sales of those comparable properties, would have

also included the value of the development rights.[23]  If the

development rights were worth $2,335,000, Mr. Ehrmann should have

subtracted that value from the before value, not added it.[24]

Respondent contends that Mr. Ehrmann's appraisal of the

unused development rights associated with the subject property is

not a qualified appraisal because, inter alia, it failed to

include the method and specific basis for valuing the development

rights.  Petitioners contend that Mr. Ehrmann's appraisal used

---

[23]It is worth noting that the floor area of development rights associated with a particular parcel is directly affected by its zoning designation, which sets the FAR for that parcel (i.e., a zoning designation with a higher FAR allots more floor area of development rights to a given parcel).  If those development rights can be used or sold, the floor area of development rights associated with a given parcel will affect that parcel's value.  That fact is inconsistent with Mr. Ehrmann's assertion in his report that different zoning designations would have no effect on the values of his chosen comparable properties.

[24]Additionally, we note that separately appraising the unused development rights and the facade easement may have overstated the loss in value due to the conservation easement. If it is true, as Mr. Ehrmann wrote in his report, that one of the reasons facade easements decrease the values of eased properties is that facade easements restrict the rights of owners to develop those properties, then Mr. Ehrmann's calculations would double count some of the loss in value because of the restriction of the development rights.

the comparable sales method to value the development rights and that he explained the basis for his valuation.

It is true that Mr. Ehrmann claimed to be applying the comparable sales method and that he identified what purported to be five comparable sales. As noted above, because of some erroneous assumptions and calculation errors, many of Mr. Ehrmann's comparable sales were not truly comparable. Instead, some of his prices per square foot reflected either prices per square foot of properties that included no additional development rights (his second and fourth comparable sales) or prices that reflected an average price per square foot for both the development rights attached to the property and additional development rights (his first comparable sale). Mr. Ehrmann should have been comparing the purchase prices per square foot for additional development rights.[25]

---

[25]Mr. Ehrmann's errors are puzzling in light of the fact that his report contained five purchases of development rights that would have been comparable to the potential sale of development rights from the subject property, yet he failed to identify them as comparable. His report contained the following five comparable purchases of development rights: The purchases of development rights and inclusionary housing floor area that were part of his second comparable, both of which were priced at $120 per square foot; the purchases of development rights that were part of his fifth comparable, which were priced at $104.17 and $291.13 per square foot; and the third comparable, priced at $142.69. The average of those five purchases is $155.60 per square foot. Or, excluding the $291.13 purchase, which is more than twice the price of any of the other purchases and seems to be an outlier, the average is $121.70 per square foot.

Despite its many errors, Mr. Ehrmann's appraisal of the development rights explained the method of valuation and the specific basis for the valuation.  His valuation was not merely a mechanical application of some predetermined figure.  Accordingly, that portion of the appraisal report does not suffer from the same fatal flaws as Mr. Ehrmann's appraisal of the facade easement.  We therefore conclude that respondent is not entitled to summary judgment with respect to the issue of whether Mr. Ehrmann's appraisal of the development rights constituted a qualified appraisal.  Because disputed issues of material fact remain, we will also deny petitioners' motion for partial summary judgment with respect to the same issue.

II.  Whether Petitioners Attached a Fully Completed Appraisal Summary to Their Tax Return

Section 1.170A-13(c)(4)(ii), Income Tax Regs., lays out the required contents of the appraisal summary, which include:

> (B)  A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed;
>
> (C)  In the case of tangible property, a brief summary of the overall physical condition of the property at the time of the contribution;
>
> (D)  The manner of acquisition (e.g., purchase, exchange, gift, or bequest) and the date of acquisition of the property by the donor * * *
>
> (E)  The cost or other basis of the property * * *

Respondent contends that petitioners' Form 8283 complied with none of those requirements. Respondent contends that because of those omissions, the entire contribution should be disallowed. Respondent cites three cases that he contends support his argument.

Petitioners contend that they substantially complied with the requirements in the regulations. Additionally, they argue that they were not required to provide information about their acquisition of or basis in the subject property because the contribution was not a contribution of tangible property.

The Form 8283 attached to petitioners' return described the subject property by providing its street address, described its condition as "Historic Facade Conservation Easement", and provided no information about Mr. Friedberg's acquisition of the subject property. The Form 8283 does not, by itself, describe the subject property in sufficient detail for respondent to determine the nature of the contribution. Indeed, it does not even mention the contribution of the unused development rights. However, petitioners also attached to their tax return the appraisal report completed by Mr. Ehrmann, which describes the contributions of a facade easement and unused development rights in sufficient detail. Petitioners contend that it is not necessary that the appraisal summary reprise everything in the appraisal; they contend it is sufficient if the appraisal summary

enables respondent to identify the subject property in the appraisal report, which it does.

Respondent contends that we have held that taxpayers are not entitled to charitable contribution deductions when they fail to provide fully completed appraisal summaries. However, in each of the cases respondent cites, the taxpayers' failures to comply with the regulations went significantly beyond the failure to fully complete the appraisal summary. In Todd v. Commissioner, 118 T.C. 334 (2002), the taxpayers did not provide a qualified appraisal, did not provide an appraisal summary, and failed to keep the records required by the regulations. In Hewitt v. Commissioner, 109 T.C. at 263, the taxpayers similarly did not obtain a qualified appraisal and attached no appraisal summary to their tax returns. Finally, in Smith v. Commissioner, T.C. Memo. 2007-368, affd. 364 Fed. Appx. 317 (9th Cir. 2009), we held that the taxpayers were not entitled to charitable contribution deductions where the Forms 8283 attached to their returns were "in many respects either improperly or incompletely prepared", the taxpayers did not establish that their accountant was a qualified appraiser, they never produced some of the appraisal reports, none of the appraisal reports were prepared or submitted on time, and those appraisal reports that they did submit did not adequately explain the appraisal methodology as required by the regulations. Accordingly, our holdings in those cases do not

support respondent's argument that petitioners are not entitled to a charitable deduction solely because they submitted a Form 8283 that was partially incomplete. In Bond v. Commissioner, 100 T.C. at 41-42, we held that because the Form 8283 the taxpayers attached to their return provided all of the important facts except for the qualifications of the appraiser, the taxpayers substantially complied with the regulations despite their failure to attach an appraisal report to their return. In the instant case, petitioners attached to their return an appraisal report that contained all of the required information, but they failed to fully complete the Form 8283 summarizing the contents of the appraisal report. If, as we held in Bond, a fully completed Form 8283 can excuse the failure to attach an appraisal report under the doctrine of substantial compliance, then, a fortiori, attaching a completed appraisal report may excuse the failure to fully complete a Form 8283 under the doctrine of substantial compliance. Consequently, we conclude that petitioners substantially complied with the requirements of section 1.170A-13(c)(4)(ii), Income Tax Regs. Their minor omissions on the Form 8283 are not enough, by themselves, to disqualify the contribution.

III. <u>Whether the Purported Transfer of Unused Development Rights Was a Valid Transfer Permitting a Deduction Pursuant to Section 170(a) or Whether the Conservation Deed Otherwise Restricted the Use of the Development Rights</u>

Petitioners contend that Mr. Friedberg's donation of the unused development rights is deductible pursuant to section 170(a) without regard to whether the donation was a qualified conservation contribution pursuant to section 170(h). Petitioners argue that Mr. Friedberg's unused development rights are transferable under New York City law and that they are a separate interest in real property. Petitioners contend that Mr. Friedberg transferred those development rights to NAT by the conservation deed.

Respondent contends that the conservation deed signed by Mr. Friedberg and NAT did not validly transfer to NAT the unused development rights associated with the subject property or otherwise restrict Mr. Friedberg's ability to use those rights. Respondent's contention is based on the premise that development rights in New York City can be transferred only pursuant to the Zoning Resolution. Respondent contends that even if Mr. Friedberg did validly transfer unused development rights to NAT, pursuant to the terms of the conservation deed, those rights were extinguished upon transfer and are therefore worthless.

The conservation deed is ambiguous as to whether Mr. Friedberg transferred the unused development rights to NAT or merely restricted the use of those rights. The conservation deed

states that, except as allowed by NAT, "there shall be no use, exercise or transfer by Grantor or Grantee of development rights from or to the Property." It later states that "all current and future development rights have been donated to the Grantee for the purpose of forever (i) removing such rights from the Property, (ii) extinguishing such rights, and (iii) further preventing the transfer or use of such rights." For the reasons explained below, we need not decide whether the conservation deed effectively transferred the unused development rights to NAT.

Petitioners contend that Mr. Friedberg's donation of the unused development rights is deductible under section 170(a) regardless of whether that donation is a qualified conservation easement. Their contention appears to be that even if the donation served no conservation purpose, it was still the contribution of something valuable and petitioners should be entitled to a deduction for the value of that gift. Yet, according to the terms of the conservation deed whereby petitioners contend Mr. Friedberg contributed the unused development rights, those development rights were contributed for the purpose of extinguishing those rights and NAT agreed not to use or transfer them. Accordingly, although the development rights may have had some value before the transfer to NAT, pursuant to the terms of that transfer those development rights became worthless.

Pursuant to the regulations, the value of a charitable contribution of property other than money is the fair market value of the property at the time of contribution.  Sec. 1.170A-1(c)(1), Income Tax Regs.  Petitioners appear to contend that the value of such a contribution should be the fair market value at the moment before contribution even if the terms of the contribution itself make the property worthless upon consummation.  We conclude that such an interpretation is inconsistent with the regulations.  We conclude that, even if Mr. Friedberg transferred the unused development rights to NAT according to the terms of the conservation deed, the value of those development rights was zero.  Consequently, unless Mr. Friedberg's donation of the unused development rights served some conservation purpose that permits it to qualify for a deduction under section 170(h), petitioners are not entitled to a deduction.[26]

---

[26]Whether Mr. Friedberg's transfer or restriction of the unused development rights served a conservation purpose is not an issue raised in the parties' motions.  Consequently, we need not decide whether the instant case is distinguishable from Herman v. Commissioner, T.C. Memo. 2009-205, where we held that the taxpayer's contribution of a conservation easement that restricted the use of some of his unused development rights was not a qualified conservation contribution because it did not preserve a "historically important land area" or a "certified historic structure" within the meaning of sec. 170(h)(4)(A)(iv).

In the alternative, petitioners contend that the conservation deed restricted Mr. Friedberg's use of the unused development rights. Petitioners stated in their answers to respondent's interrogatories that the conservation deed transferred the development rights to NAT, not that it restricted those rights. Respondent contends that petitioners should be bound by their responses to interrogatories and that therefore we should not consider petitioners' alternative argument. We disagree. Our interpretation of the conservation deed is not bound by petitioners' interpretation of that document. Whether or not the conservation deed effectively transferred the unused development rights to NAT, it did restrict Mr. Friedberg's use of development rights associated with the subject property.

Mr. Friedberg granted a conservation easement to NAT. At common law, an easement is "a permanent right conferred by grant or prescription, authorizing one landowner to do or maintain something on the adjoining land of another, which, although a benefit to the land of the former, and a burden upon the land of the latter, is not inconsistent with general ownership." Trustees of Freeholders & Commonalty of the Town of Southampton v. Jessup, 56 N.E. 538, 539 (N.Y. 1900). New York has enacted a statute permitting the creation of conservation easements. See N.Y. Envtl. Conserv. Law sec. 49-0305 (McKinney 2008). Pursuant to the statute, a conservation easement may be created or

conveyed by a written instrument that complies with New York's statute of frauds.  Id.; N.Y. Gen. Oblig. Law sec. 5-703 (McKinney 2008).  A conservation easement may be held by a not-for-profit conservation organization and is of perpetual duration unless otherwise provided in the instrument granting it.  N.Y. Envtl. Conserv. Law sec. 49-0305.  The easement must be recorded in the appropriate office, and it must provide an adequate legal description of the property encumbered.  Id.  Conservation easements are distinct from easements recognized at common law in that conservation easements are statutorily excepted from many defenses that might defeat common law easements.  Id.; Stonegate Family Holdings, Inc. v. Revolutionary Trails, Inc., 900 N.Y.S.2d 494, 499 (App. Div. 2010).  For instance, conservation easements need not be appurtenant to an interest in real property.  N.Y. Envtl. Conserv. Law sec. 49-0305; Stonegate Family Holdings, Inc. v. Revolutionary Trails, Inc., supra at 499.

Granting a conservation easement on a tract of land does not actually transfer ownership of the property, but it may nonetheless restrict the grantee's use of it.  According to the conservation deed, in addition to granting a facade easement on the subject property, Mr. Friedberg gave up his right to any future use or transfer of development rights.  The conservation deed complied with New York's requirements for a valid conservation easement.  Accordingly, we conclude that, by grant

of the conservation deed, Mr. Friedberg restricted the use of development rights associated with the subject property. Nonetheless, petitioners are not entitled to a deduction unless the restriction of the unused development rights served a conservation purpose that permits it to qualify for a deduction pursuant to section 170(h). See 1982, LLC v. Commissioner, T.C. Memo. 2011-84; Herman v. Commissioner, T.C. Memo. 2009-205.

IV.  Whether the Donation of the Conservation Easement Was Granted in Perpetuity

Respondent contends that Mr. Friedberg's contribution of the conservation easement was not a qualified conservation contribution because it was not granted in perpetuity. Respondent's contention is based on the following language from the conservation deed:  "nothing herein contained shall be construed to limit * * * [NAT's] right to give its consent (e.g., to changes in the Facade) or to abandon some or all of its rights hereunder" (abandonment clause).  Petitioners contend that respondent's argument ignores prior decisions of this Court in which we have held that deeds with similar language nonetheless granted conservation easements in perpetuity.

A contribution will not be considered to be exclusively for conservation purposes unless such purposes are "protected in perpetuity" (perpetuity requirement).  Sec. 170(h)(5)(A); see also sec. 1.170A-14(g)(1), Income Tax Regs.  However, the regulations permit a deduction even if the deed allows some

future development as long as "the terms of the restrictions require that such development conform with appropriate local, state, or Federal standards for construction or rehabilitation within the district."  Sec. 1.170A-14(d)(5), Income Tax Regs.

In Simmons v. Commissioner, 646 F.3d 6 (D.C. Cir. 2011), affg. T.C. Memo. 2009-208, the Court of Appeals for the District of Columbia Circuit considered whether language identical to the abandonment clause violated the perpetuity requirement.  The Court of Appeals rejected the Commissioner's argument that such language violates the perpetuity requirement.  It noted that the deeds imposed obligations upon the taxpayer "in perpetuity".  Id. at 10.  It also noted that the terms of the deeds stated that they would "survive any termination of the Grantor's or Grantee's existence."  Although the deeds did not specify what would happen if the donee organization dissolved, the Court of Appeals found it sufficient that District of Columbia law provides that such easements would be transferred to another organization performing similar activities.

Similarly, Mr. Friedberg's conservation deed imposes obligations in perpetuity and states that the easement will survive any termination of the grantor's or grantee's existence. The conservation deed also states that NAT may not transfer the easement except to another "'qualified organization' described in Section 170(h)(3)".  New York State law provides that a

conservation easement held by a not-for-profit organization may be modified or extinguished only:  "(a) as provided in the instrument creating the easement; or (b) in a proceeding pursuant to section nineteen hundred fifty-one of the real property actions and proceedings law; or (c) upon the exercise of the power of eminent domain."  N.Y. Envtl. Conserv. Law sec. 49-0307 (McKinney 2008).  A New York court could permit abandonment of a conservation easement only if it found "no actual and substantial benefit * * * either because the purpose of the restriction has already been accomplished or, by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason."  N.Y. Real. Prop. Acts. Law sec. 1951 (McKinney 2009).  We conclude that the terms of the conservation deed, combined with the New York State law governing conservation easements, do not violate the perpetuity requirement of section 170(h)(5)(A).

However, the Court of Appeals in Simmons also considered a factual issue:  the remoteness of the possibility that the donee would actually abandon its rights.  Even though the conservation easement might be protected by the terms of the conservation deed and even by State law, it is nonetheless essential that the donee actively monitor the property and enforce any violations of the terms of the easement.  In Simmons v. Commissioner, supra at 10, the Court of Appeals stated that "the Commissioner has not shown

the possibility L'Enfant [the donee] will actually abandon its rights is more than negligible." The Court of Appeals noted that L'Enfant has been holding and monitoring easements since 1978, yet the Commissioner had failed to point to a single instance where L'Enfant had abandoned its right to enforce those easements. Id. Similarly, in Stotler v. Commissioner, T.C. Memo. 1987-275, this Court rejected the Commissioner's argument that the contribution failed the perpetuity requirement because we concluded that the possibility the donee would abandon the conservation easement was "so remote as to be negligible". As in Simmons, our decision in Stotler was based in part on facts in the record that allowed us to conclude that the possibility of abandonment was remote.

In the instant case, the parties have not addressed NAT's history of enforcing easements, and there is nothing in the record that would allow us to consider the likelihood that NAT would abandon the easement. Accordingly, although we hold the abandonment clause does not violate the perpetuity requirement, we do not decide whether the possibility that NAT would abandon the conservation easement is "so remote as to be negligible".

We conclude that respondent is entitled to summary judgment on the issue of whether petitioners submitted a qualified appraisal with respect to the facade easement. Consequently, we hold that petitioners are not entitled to a charitable

contribution deduction with respect to the facade easement.  We further conclude that petitioners are entitled to summary judgment on the issues of whether their appraisal report substantially complied with section 1.170A-13(c)(3)(ii)(C), (H), and (I), Income Tax Regs., whether their appraisal summary substantially complied with section 1.170A-13(c)(4)(ii), Income Tax Regs., and whether the conservation deed restricted Mr. Friedberg's use of the unused development rights.  With respect to the remaining issues, including the issue of whether petitioners submitted with their return a qualified appraisal with respect to the development rights, we conclude that there are disputed issues of material fact and we will deny the parties' motions for partial summary judgment.

In reaching these holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.