T.C. Memo. 2013-224

UNITED STATES TAX COURT

BARRY S. FRIEDBERG AND CHARLOTTE MOSS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 9530-09.                     Filed September 23, 2013.

Kathleen M. Pakenham, for petitioners.

Robert W. Mopsick, for respondent.

SUPPLEMENTAL MEMORANDUM OPINION

WELLS, Judge:  Respondent determined a deficiency of $1,321,250 and a

penalty pursuant to section 6662(h)[1] of $528,500 with respect to petitioners' 2003

_____

[*]This opinion supplements Friedberg v. Commissioner, T.C. Memo. 2011-238.

[1]Unless otherwise indicated, section references are to the Internal Revenue
                                                        (continued...)

[*2] tax year. In a prior opinion filed September 3, 2011, <u>Friedberg v.</u> <u>Commissioner</u>, T.C. Memo. 2011-238, 2011 WL 4550136 (prior opinion), we granted partial summary judgment on the issue of whether the appraisal report prepared by Michael Ehrmann of Jefferson & Lee Appraisals, Inc., and attached to petitioners' 2003 joint Federal income tax return (Ehrmann appraisal) was a qualified appraisal as defined in section 1.170A-13(c)(3), Income Tax Regs. We held that the Ehrmann appraisal was not a qualified appraisal as it related to petitioners' facade easement. We further held that there remained issues of material fact regarding whether the Ehrmann appraisal was a qualified appraisal as it related to petitioners' transfer of development rights. Petitioners move the Court, pursuant to Rule 161, to reconsider our prior opinion.

<u>Background</u>

Many of the underlying facts are set out in detail in our prior opinion and are incorporated herein by reference. We summarize the factual and procedural background briefly here and make additional findings as required for our ruling on petitioners' motion for reconsideration. The facts are based upon examination of

---

[1](...continued)
Code of 1986, as amended (Code) and in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3] the pleadings, moving papers, responses, and attachments, including numerous affidavits supplied by petitioners. Petitioners are husband and wife who resided in New York at the time they filed their petition.

During 2002, Mr. Friedberg purchased a residential townhouse in New York City on East 71st Street between Park Avenue and Lexington Avenue (subject property) for $9,400,000, and then paid approximately an additional $4 million for extensive renovations. The subject property is in Manhattan's Upper East Side Historic District. On October 15, 2003, the National Park Service determined that the subject property "contributes to the significance of the * * *[Upper East Side Historic District] and is a 'certified historic structure' for a charitable contribution for conservation purposes in accordance with the Tax Treatment Extension Act of 1980."

During 2003, the National Architectural Trust (NAT) contacted Mr. Friedberg to ask him to donate an easement on the subject property. Mr. Friedberg met with Sean Zalka, a representative from NAT, to discuss donating a facade easement and development rights related to the subject property. Mr. Zalka then sent Mr. Friedberg a spreadsheet that provided an estimate of the tax savings available to Mr. Friedberg should he decide to donate to NAT the facade easement

[*4] and development rights for the subject property. Mr. Zalka's spreadsheet read as follows:

THE NATIONAL ARCHITECTURAL TRUST

Profile of Estimated Tax Benefit[1]

134 East 71st Street (Development Rights Extinguished)

| | |
|---|---|
| Estimated Fair Market Value | $ 13,000,000 |
| | |
| Conservation Easement Value (11% of FMV)[2] | $ 1,430,000 |
| Estimated Development Rights Value | $ 2,070,000 |
|  (See Development Rights Analysis Worksheet) | |
| Total Estimated Gross Tax Deduction | $ 3,500,000 |
| | |
| Tax-Deductible Cash Donations | $ 350,000 |
|  (10% of Gross Tax Deduction) | |
| Appraisal | $ 16,000 |
| Lender Subordination Fee (if applicable) | |
| Total Estimated Tax-Deductible Costs | $ 366,000 |
| | |
| Total Estimated Charitable Contribution Tax Deduction | $ 3,866,000 |
| | |
| Total Estimated Federal, State and City Income Tax Savings (42.5% Tax Bracket) | $ 1,643,050 |
| | |
| Total Estimated Cash Savings | $ 1,277,050 |

[1] For illustrative purposes only.  Please consult your tax advisor.

[2] Actual figure determined by appraisal, typically 11% of FMV for comparable properties.

**[*5]** After reviewing NAT's materials, Mr. Friedberg decided to donate to NAT a facade easement and all of the development rights associated with the subject property.

Mr. Friedberg followed NAT's recommendation and engaged Michael Ehrmann of Jefferson & Lee Appraisals, Inc., based in Pittsburgh, to appraise the subject property. Mr. Ehrmann visited the subject property and conducted an inspection during November 2003 and subsequently prepared the Ehrmann appraisal, which states that it "has been prepared for tax purposes, in order to determine the loss of value due to a facade easement to be donated on the subject property." The Ehrmann appraisal includes a number of pages of background on the economic, social, cultural, environmental, and political forces that influence property values in New York City.

On the basis of the lot's location in an R9X zoning district, permitting a "floor area ratio"[2] (FAR) of 9.0 for residential property, Mr. Ehrmann calculated

---

[2]New York, N.Y. Zoning Resolution sec. 12-10 (2011) provides the following definition for "floor area ratio":

> "Floor area ratio" is the total floor area on a zoning lot, divided by the lot area of that zoning lot. If two or more buildings are located on the same zoning lot, the floor area ratio is the sum of their floor areas divided by the lot area. (For example, a zoning lot of 10,000 square

(continued...)

[*6] that the lot had a maximum development potential of 20,786.94 square feet, approximately 13,731 square feet of which was unused.[3] Mr. Ehrmann wrote:

> Although the underlying zoning would permit expansion of the subject property up to the maximum development potential, I believe that the New York City Landmarks Preservation Commission, which has authority over the Upper East Side Historical [sic] District, would block such an expansion. However, the subject owner clearly has the right to transfer/see [sic] these development rights for use on neighboring blocks within the Historical District. Furthermore, I believe that developments utilizing Transferable Development Rights (TDR) would [be] feasible in this area, particularly along Lexington Avenue.
>
> New York statutes define transfer of development rights (TDR) as "the process by which development rights are transferred from one lot, parcel, or area of land in a sending district to another lot, parcel, or area of land in one or more receiving districts." * * *
>
> In many TDR programs, the zoning provisions applicable to the sending district are amended to reduce the density at which land can be developed. While losing their right to develop their properties at the formerly permitted densities, property owners in the sending district are awarded development rights. These development rights are regarded as severable from the land ownership and transferable by their owners. * * *

---

[2](...continued)
feet with a building containing 20,000 square feet of floor area has a floor area ratio of 2.0, and a zoning lot of 20,000 square feet with two buildings containing a total of 40,000 square feet of floor area also has a floor area ratio of 2.0).

[3]Respondent accepts those numbers as accurate for purposes of the parties' cross motions for partial summary judgment addressed in our prior opinion.

[*7] The Ehrmann appraisal then describes different aspects of transferable development rights programs in general, without any reference to the particular program implemented in New York City.

Mr. Ehrmann found that the "sales comparison approach" was the most appropriate valuation method for estimating the market value of the subject property before and after the donation. He wrote: "In the following sections of this report, I have estimated the market value of the subject property both before and after donation of the proposed easement utilizing the Sales Comparison Approach to value." Mr. Ehrmann used the following sales to estimate the before value of the subject property:

| Date | Address | Sale price | Square feet | Price per square foot | Adjusted $/sq ft | Historic district? |
|---|---|---|---|---|---|---|
| 4/15/03 | 36 East 67th St | $9,750,000 | 16,235 | $1,216.51 | $1,655.80 | Yes |
| 3/26/03 | 631 Park Ave | 9,650,000 | 5,143 | 1,876.34 | 1,778.20 | Yes |
| 1/17/03 | 151 East 72d St | 8,187,500 | 5,885 | 1,391.25 | 1,701.13 | No |
| 1/15/03 | 123 East 73d St | 10,250,000 | 8,625 | 1,188.41 | 1,775.24 | Yes |
| 8/26/02 | 54 East 92d St | 9,000,000 | 4,320 | 2,083.33 | 2,595.79 | No |
| 6/17/02 | 10 East 87th St | 8,200,000 | 8,791 | 932.77 | 1,609.16 | No |
| 5/6/02 | 46 East 69th St | 10,250,000 | 8,500 | 1,205.88 | 1,755.77 | Yes |
| 2/16/02 | 20 East 73d St | 17,000,000 | 9,345 | 1,819.15 | 2,281.21 | Yes |
| 2/14/02 | 10 East 75th St | 8,250,000 | 8,930 | 923.85 | 1,527.13 | Yes |

Mr. Ehrmann adjusted those sale prices to take into account differences between those properties and the subject property due to the following factors: time of

[*8] sale; location; condition of the property; size; and whether the property included a finished basement. Although the properties were subject to different zoning, Mr. Ehrmann did not make any adjustments on that basis because, he wrote: "I do not believe that the varying zones have an impact on subject value." After making all of his adjustments, Mr. Ehrmann averaged the adjusted prices and arrived at $1,853.27 per square foot, which he rounded to $1,855 and used as his estimate for the value of the subject property as of the appraisal date. On the basis of the subject property's gross floor area of 7,056 square feet, Mr. Ehrmann estimated that the subject property's total value was $13,090,000.

In addition to estimating the subject property's fair market value, Mr. Ehrmann sought to appraise the development rights that "could be transferred to a nearby property s [sic] as TDRs." To do so, he identified five transfers involving development rights on the east side of Manhattan. Three of the five transfers involved the sale of development rights by themselves; the other two each involved the sale of an entire tract that included development rights previously acquired. Mr. Ehrmann calculated the price per FAR foot for each of the sales and then averaged those figures to reach an average of $154 per FAR foot. He then considered some general categories of adjustments, including time, location, size, zoning, and historic restrictions. With regard to historic restrictions, he wrote:

**[*9]**    The subject is part of the Upper East Side Historic District, with significant historic restrictions.  None of the previous improvements on the comparable sites had a similar status.  Furthermore, there do not appear to be historically protected properties in the immediate vicinities of the TDR comparables.  As discussed previously, the subject TDRs can only be utilized in a limited geographic area near the site.  However, the TDRs transferred to the comparable properties do not appear to have had the same restriction.

I believe that the restrictions on the subject TDRs make these development rights somewhat less valuable than the apparently unrestricted rights purchased in the comparable transactions.

Mr. Ehrmann's comments reflect the fact that none of the other properties he considered was in a historic district.  The average price per FAR foot of the comparable properties Mr. Ehrmann reported on was $154.  However, Mr. Ehrmann estimated that the value of the unused development rights on the subject property was $170 per FAR foot.  He explained his reasoning as follows:

I have identified five adjustment factors applicable to the TDR comparables.  Three of the factors--time, location, and size of the TDR--support upward adjustments of a number of the comparable unit prices.  The two other factors--zoning and landmark limitations--support downward adjustments of all of the comparable unit prices.

TDR transactions are complex.  I have not made specific adjustments of each comparable for each adjustment factor discussed above.  However, based on the overall adjustments, I estimate that the value of the TDRs on the subject property as of $170.00 per FAR foot.

[*10] Mr. Ehrmann calculated that the total value of the unused development rights associated with the subject property was $2,335,000. He then added that value to his before estimate of the value of the subject property to arrive at a total value for the subject property of $15,425,000.

The second half of the Ehrmann appraisal provides an estimate of the value of the subject property after the facade easement. In an introduction, Mr. Ehrmann explained that there are several reasons property values are negatively affected by facade easements. One of the factors he listed was "the loss of the right to develop the property up to the maximum density allowed under the subject zone." Other factors included potentially increased maintenance costs, loss of flexibility in changing exterior design, and the inability of future owners to use the tax advantages from an easement contribution. Mr. Ehrmann noted:

> The best measure of the impact of these elements on property values is the market place [sic]. I have been able to identify a number of examples of the impact of easements on properties in both New Orleans and Washington, two cities where facade easements have been most actively used.

Mr. Ehrmann provided six examples of sales of eased properties in Washington, D.C., during the mid-1980s and two examples of transactions involving eased properties in New Orleans during the mid-1990s. Mr. Ehrmann constructed the

[*11] following table to summarize his research on sales of comparable properties

involving facade easements:

| Property # | Easement loss |
|:----------:|:-------------:|
| 1 | 27.9% |
| 2 | 18.3% |
| 3 | 8.9% |
| 4 | 18.6% |
| 5 | 22.5% |
| 6 | 8% |
| 7 | 30-40% increase in renovation costs |
| 8 | 11+% |

The average facade "easement loss" of the six sales of eased properties (i.e.,

properties 1 through 6, the Washington, D.C., sales) was 17.4%.  However, Mr.

Ehrmann estimated that the facade easement on the subject property decreased its

value by 11%.  He provided the following analysis to explain his reasoning:

> The comparable data shows estimated losses ranging from 8% to 27.9%.  The residential properties had losses ranging from 8% to 22.5%.  Most of the examples that I have identified took place during the 1980s, when the facade easement programs in both Washington and New Orleans were relatively new.  Comparables #7 and #8 are based on recent market developments.
>
> The subject property is a residential dwelling in excellent condition and degree of finish.  Based on the comparable data, with particular emphasis on Eased Property #8, I estimate that [the] facade easement will result in a loss of value of 11% of the value of the actual subject improvement before donation of the easement.

[*12] On the basis of his estimate of 11%, Mr. Ehrmann calculated that the facade easement would reduce the value of the subject property by $1,439,000, which he rounded to $1,440,000. He stated that after the easement the unused development rights would have no value. He therefore estimated that the "after" value of the subject property was $11,650,000. Mr. Ehrmann concluded that the loss in value due to the facade easement was $3,775,000.[4]

Petitioners timely filed their joint 2003 Federal income tax return. They deducted $3,775,000 for the donation of the facade easement and development rights on the subject property. Petitioners appended Form 8283, Noncash Charitable Contributions, signed by Mr. Ehrmann and by the president of NAT. Petitioners also attached to their tax return a copy of the Ehrmann appraisal. On or about January 23, 2009, respondent mailed to petitioners' last known address a statutory notice of deficiency. Petitioners timely filed their petition with this Court on April 20, 2009.

During December 2010, each party filed a motion for partial summary judgment. Petitioners moved that, inter alia, the Court grant summary judgment that the Ehrmann appraisal of the value of the easement was a "qualified

---

[4]That figure reflects the value of both the facade easement and the development rights, but Mr. Ehrmann stated that it represented "the estimated market value of the loss due to the easement."

[*13] appraisal" within the meaning of section 1.170A-13(c)(3), Income Tax Regs. Respondent moved that the Court grant summary judgment that petitioners are not entitled to a charitable contribution deduction related to their 2003 donation of the facade easement and development rights because, inter alia, "petitioners failed to substantiate their deduction * * * as required by section 155(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 691, ("DEFRA") and Treas. Reg. § 1.170A-13(c)." Specifically, we were asked to determine whether the Ehrmann appraisal included the "method of valuation" and the "specific basis for the valuation" pursuant to section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs.

On October 3, 2011, we issued our prior opinion addressing the parties' cross-motions for partial summary judgment. Relying in part on Scheidelman v. Commissioner, T.C. Memo. 2010-151, 2010 WL 2788205 (Scheidelman I), vacated and remanded, 682 F.3d 189 (2d Cir. 2012), we held that petitioners were not entitled to a deduction for the donation of the facade easement because the Ehrmann appraisal was not a "qualified appraisal" pursuant to section 1.170A-13(c)(3), Income Tax Regs., with respect to its valuation of the facade easement. Accordingly, we granted respondent's motion for partial summary judgment with respect to that issue. However, with respect to the valuation of the development rights, we concluded that disputed issues of material fact remained as

**[\*14]** to whether the Ehrmann appraisal was a qualified appraisal. Accordingly, we denied both parties' motions for partial summary judgment with respect to that issue.

On June 15, 2012, the U.S. Court of Appeals for the Second Circuit vacated our decision in Scheidelman I and remanded the case. Scheidelman v. Commissioner, 682 F.3d 189 (2d Cir. 2012) (Scheidelman II). On July 17, 2012, respondent deposed Mr. Ehrmann in the presence of petitioners' counsel. During the deposition Mr. Ehrmann stated that he had never appraised other transferrable development rights before issuing the Ehrmann appraisal and that Mr. Friedberg knew of this fact.

On August 1, 2012, petitioners moved the Court to reconsider our prior opinion because of the change in law governing the issues noted above. On September 7, 2012, respondent filed a response to petitioners' motion for reconsideration.

## Discussion

Reconsideration under Rule 161 is intended to correct substantial errors of fact or law and allow the introduction of newly discovered evidence that the moving party could not have introduced, by the exercise of due diligence, in the

**[*15]** prior proceeding.  See Knudsen v. Commissioner, 131 T.C. 185 (2008); Estate of Quick v. Commissioner, 110 T.C. 440, 441-442 (1998).  We have broad discretion as to whether to grant a motion for reconsideration, but will not do so unless the moving party can point to unusual circumstances or substantial error. Estate of Quick v. Commissioner, 110 T.C. at 441-442; see also Vaughn v. Commissioner, 87 T.C. 164, 166-167 (1986).  "Reconsideration is not the appropriate forum for rehashing previously rejected legal arguments or tendering new legal theories to reach the end result desired by the moving party."  Estate of Quick v. Commissioner, 110 T.C. at 441-442.

However, an intervening change of controlling law may warrant our exercising that discretion.  See Doe v. N.Y.C. Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir. 1983); see also Alioto v. Commissioner, T.C. Memo. 2008-185, 2008 WL 2945349, at *8.  We based our prior opinion in part on a similar legal analysis as that contained in Scheidelman I.  The U.S. Court of Appeals for the Second Circuit vacated and remanded Scheidelman I, see Scheidelman II, 682 F.3d 189, and, absent stipulation to the contrary, this case is appealable to that court.  In accordance with Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), we conclude that the decision by the Court of Appeals

[*16] in <u>Scheidelman II</u> specifically alters the underlying law and, therefore, requires that we reconsider our prior opinion.

Petitioners ask us to reconsider whether the Ehrmann appraisal met the requirements of a "qualified appraisal" pursuant to section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs., with respect to both the facade easement and the development rights. We address each issue in turn.

I.    Facade Easement

In our prior opinion we determined that Mr. Ehrmann's approach to valuing the subject property after the facade easement donation diverged significantly from the accepted comparable sales method, which was the method Mr. Ehrmann claimed to apply. We determined that Mr. Ehrmann instead used sale and nonsale transactions of eased properties in locations other than New York City, which is the site of the subject property, to estimate a percentage diminution in value associated with a facade easement. Mr. Ehrmann then multiplied the before value of the subject property, the calculation of which respondent did not contest, by the percentage diminution that he purported to derive from the transactions noted above to estimate the loss in value on account of the facade easement.[5] In

_____

[5]As we noted in our prior opinion in this case, it appears that Mr. Ehrmann arrived at 11%, the percentage of fair market value that NAT had told Mr.

(continued...)

**[*17]** <u>Scheidelman I</u>, we held that the mechanical application of a percentage diminution to the fair market value before donation of a facade easement does not constitute a method of valuation as contemplated under section 1.170A-13(c)(3), Income Tax Regs. <u>Scheidelman I</u>, 2010 WL 2788205, at *9. Accordingly, our prior opinion in this case held, consistent with our decision in <u>Scheidelman I</u>, that the Ehrmann appraisal was not a qualified appraisal with respect to the facade easement because it lacked a method and specific basis for the determined value.

The U.S. Court of Appeals for the Second Circuit vacated this Court's decision in <u>Scheidelman I</u> and remanded the case. <u>See</u> <u>Scheidelman II</u>, 682 F.3d 189. Concerning whether an appraisal includes the method of valuation as required by section 1.170A-13(c)(3)(ii)(J), Income Tax Regs., the Court of Appeals in <u>Scheidelman II</u> stated:

> For the purpose of gauging compliance with the reporting requirement, it is irrelevant that the * * * [Commissioner] believes the method employed was sloppy or inaccurate, or haphazardly applied * * *. The regulation requires only that the appraiser identify the valuation method "used"; it does not require that the method adopted be reliable. * * * By providing the information required by the regulation, * * * [the appraiser] enabled the * * * [Commissioner] to evaluate his methodology.

---

[5](...continued)
Friedberg was typical for facade easements, in spite of his research on comparable sales and not because of it.

**[*18]** Id. at 196-197 (fn. ref. omitted). The Court of Appeals held that "the Commissioner's interpretation, that an unreliable method is no method at all, goes beyond the wording of the regulation, which imposes only a reporting requirement." Id. n.6. Concerning whether an appraisal includes the specific basis for the valuation as required by section 1.170A-13(c)(3)(ii)(K), Income Tax Regs., the Court of Appeals stated that the purpose of that reporting regulation was to provide the Commissioner with "sufficient information to evaluate the claimed deduction and 'deal more effectively with the prevalent use of overvaluations.'" Id. at 198 (quoting Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd, 166 F.3d 332 (4th Cir. 1998)). The Court of Appeals held that the requirement of section 1.170A-13(c)(3)(ii)(K), Income Tax Regs., is fulfilled if the appraiser's analysis is present, even if the Commissioner deems it to be unconvincing. Scheidelman II, 682 F.3d at 198.

In their motion for reconsideration, petitioners contend that the Ehrmann appraisal included a method of valuation because it supplied enough information to enable the Commissioner to evaluate his methodology and showed how he applied the method. Petitioners acknowledge that we previously concluded that Mr. Ehrmann's stated method was improperly applied and unreliable but contend that reliability is not a factor for purposes of determining whether the Ehrmann

**[\*19]** appraisal is a qualified appraisal.  Respondent opposes petitioners' motion for reconsideration with respect to the facade easement and contends that (1) petitioners misstate the proper standard articulated by the Court of Appeals in Scheidelman II, (2) the Ehrmann appraisal is not a qualified appraisal even if we apply the standard that petitioners advocate, and (3) the Ehrmann appraisal fails to include a specific basis for valuation.[6]  We disagree with all three of respondent's contentions.

Respondent first contends that petitioners misstate the standard that the Court should apply and that the proper standard is to determine whether the method of valuation stated in the appraisal is the method actually used by the

---

[6]Respondent also contends that we did not rest our prior opinion entirely on the legal analysis contained in Scheidelman v. Commissioner, T.C. Memo. 2010-151, 2010 WL 2788205 (Scheidelman I), vacated and remanded, 682 F.3d 189 (2d Cir. 2012) (Scheidelman II), pointing to our scarce citations of that case and that we instead relied on Friedman v. Commissioner, T.C. Memo. 2010-45, 2010 WL 845949, and Jacobson v. Commissioner, T.C. Memo. 1999-401, 1999 WL 1127811, which the Court of Appeals for the Second Circuit approved.  Respondent's contention is without merit.  The Court of Appeals' opinion in Scheidelman II vacated this Court's decision in Scheidelman I with respect to the same analysis we used in this case in our prior opinion and distinguished both Friedman and Jacobson.  See Scheidelman II, 682 F.3d at 197-198 (stating that the appraisals in those cases "failed altogether to 'even indicate the valuation method used or the basis for the appraised values'" (quoting Friedman v. Commissioner, 2010 WL 845949, at \*4) and "'provided no methodology or rationale'" (quoting Jacobson v. Commissioner, 1999 WL 1127811, at \*2).  Pursuant to Golsen v. Commissioner, 54 T.C. at 757, the Court of Appeals' opinion controls our analysis in the instant case.

[*20] appraiser. We disagree. In Scheidelman II, 682 F.3d at 197, the Court of Appeals stated that the relevant question is whether the information provided "enabled the * * * [Commissioner] to evaluate * * * [the appraiser's] methodology". See also Rothman v. Commissioner, T.C. Memo. 2012-218, 2012 WL 3101513, at *4. Moreover, the Court of Appeals clarified that "it is irrelevant that the * * * [Commissioner] believes the method employed was sloppy or inaccurate, or haphazardly applied". Scheidelman II, 682 F.3d at 197 (emphasis added). Scheidelman II is clear; the regulations are a reporting requirement. Id. at 197 & n.6. Thus, pursuant to Scheidelman II, any evaluation of accuracy is irrelevant for purposes of deciding whether the appraisal is qualified pursuant to section 1.170A-13(c)(3)(ii)(J), Income Tax Regs.

Respondent also contends that the Ehrmann appraisal fails to enable respondent to evaluate Mr. Ehrmann's methodology. Respondent argues that the Ehrmann appraisal "merely set forth certain disconnected and meaningless steps that Mr. Ehrmann took" and that "the 11% value was arrived at in spite of his research." While we note that we previously determined that "[n]othing in Mr. Ehrmann's report supports his conclusion about the after value of the subject property", Friedberg v. Commissioner, 2011 WL 4550136, at *15, we concede that reaching that determination first required us to evaluate Mr. Ehrmann's

[*21] methodology. Although we continue to question whether the Ehrmann appraisal is reliable or properly applied methodology to reach its conclusions, we conclude that it provides sufficient information to enable respondent to evaluate Mr. Ehrmann's underlying methodology. Accordingly, we conclude that the Ehrmann appraisal includes a method of valuation as required by section 1.170A-13(c)(3)(ii)(J), Income Tax Regs., with respect to the facade easement.

Regarding the requirements of section 1.170A-13(c)(3)(ii)(K), Income Tax Regs., respondent contends that the Ehrmann appraisal did not provide a specific basis for the valuation because it lacked reasoned analysis and arrived at the value of the facade easement in spite of Mr. Ehrmann's research, not because of it. The Court of Appeals held that there is a specific basis for the valuation if the appraiser's analysis is present, even if the Commissioner deems it unconvincing. Scheidelman II, 682 F.3d at 198 ("The Commissioner may deem * * * [the appraiser's] 'reasoned analysis' unconvincing, but it is incontestably there."). As we stated in our prior opinion, the Ehrmann appraisal compared eight different properties with facade easements, for which Mr. Ehrmann allegedly considered, inter alia, each property's location, size, local government laws and regulations, use, date of easement, appreciation of value, and improvements. Although we criticized and disagreed with Mr. Ehrmann's analysis, it was "incontestably there".

**[*22]** See id. Indeed, respondent's own argument concedes that the Ehrmann appraisal contained some research and analysis because respondent concludes that value was determined in spite of that research. Accordingly, we conclude that the Ehrmann appraisal includes a specific basis for Mr. Ehrmann's valuation as required by section 1.170A-13(c)(3)(ii)(K), Income Tax Regs., with respect to the facade easement.

Consequently, pursuant to Scheidelman II, we conclude that the Ehrmann appraisal is a qualified appraisal pursuant to section 1.170A-13(c)(3)(ii), Income Tax Regs., with respect to petitioners' facade easement. However, we specifically do not opine on the reliability and accuracy of the methodology and specific basis of valuation in the Ehrmann appraisal, a matter we leave to be decided at trial.

II.    Development Rights

In our prior opinion we determined that Mr. Ehrmann's method of using five comparable transactions involving development rights to estimate the value of the subject property's unused development rights was inconsistent and contained mathematical errors and erroneous assumptions. Although we determined that Mr. Ehrmann claimed to be applying the comparable sales method to calculate a price per square foot of the development rights, we were not convinced that the comparable sales transactions were truly comparable. Instead of comparing the

[*23] purchase prices per square foot for additional development rights, Mr. Ehrmann compared prices per square foot of properties that included no additional development rights or averaged prices per square foot for both development rights attached to the property and additional development rights.  However, we determined that the Ehrmann appraisal nonetheless explained the method and specific basis of valuation with respect to the development rights.  Because we questioned the Ehrmann appraisal's accuracy and reliability and whether it adequately evaluated the market demand for and transferability of development rights, we held that issues of material fact remained regarding whether the Ehrmann appraisal was a qualified appraisal with respect to the development rights.[7]

In their motion for reconsideration, petitioners contend that our prior opinion concludes that the Ehrmann appraisal included the method of valuation and specific basis for the valuation of the development rights.  Petitioners contend that remaining issues of material fact, which caused us to deny petitioners' motion for summary judgment with respect to this issue in our prior opinion, are relevant

_____

[7]This Court did not discuss qualified appraisals of development rights in Scheidelman I.  However, the Court of Appeals for the Second Circuit's analysis of  sec. 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs., applies as much to a valuation of development rights as it does to a valuation of a facade easement.  We do not deem it necessary to restate that analysis, which we discussed above.

**[*24]** only to determining the value of the development rights and not to determining whether the Ehrmann appraisal is qualified under the Scheidelman II analysis. We agree with petitioners. Under Scheidelman II, section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs., "imposes only a reporting requirement" and the taxpayer only needs to include sufficient information to allow the Commissioner to evaluate the methodology and specific basis for valuation. Scheidelman II, 692 F.3d at 196-198, n.6. In our prior opinion, we stated that, despite errors, the Ehrmann appraisal "explained the method of valuation and the specific basis for the valuation" of the development rights. Friedberg v. Commissioner, 2011 WL 4550136, at *22. The remaining issues of material fact (e.g., the effect of the market demand, the transferability of the development rights, and the accuracy and reliability of the Ehrmann appraisal) are relevant to our analysis of valuation but are irrelevant as to whether the Ehrmann appraisal is

[*25] qualified pursuant to section 1.170A-13(c)(3), Income Tax Regs.[8] See Scheidelman II, 692 F.3d at 196-198.

Respondent does not object to petitioners' motion for reconsideration with respect to whether the Ehrmann appraisal is a qualified appraisal of development rights but contends that we should consider additional factual developments that have arisen since our prior opinion and, in result, grant summary judgment to respondent. Specifically, respondent contends that, at a deposition after our prior opinion, Mr. Ehrmann confirmed that he had never appraised other transferrable development rights before issuing the Ehrmann appraisal and that Mr. Friedberg knew of this fact. Consequently, respondent contends that Mr. Ehrmann was not a qualified appraiser of transferable development rights pursuant to section 1.170A-

_____

[8]Respondent contends that the Ehrmann appraisal is not qualified because it assumed a highest and best use for the development rights without adequately assessing the market demand for those rights with a market study. We disagree. We have previously held that, when using the comparable sales method, the before value "is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement." Hilborn v. Commissioner, 85 T.C. 677, 689 (1985). However, valuation is not a precise science, and the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. Kiva Dunes Conservation, LLC v. Commissioner, T.C. Memo. 2009-145, 2009 WL 1748862, at *3. Like the other questions of fact noted above, respondent's contentions as to the defects of the Ehrmann appraisal are irrelevant as to whether the Ehrmann appraisal is a qualified appraisal pursuant to sec. 1.170A-13(c)(3), Income Tax Regs.

[*26] 13(c)(5), Income Tax Regs., and therefore, the Ehrmann appraisal was not a qualified appraisal.[9]  We disagree.

Pursuant to section 1.170A-13(c)(5), Income Tax Regs.,[10] a qualified appraiser is an individual who includes on the appraisal summary[11] a declaration that:  (1) the individual either holds himself or herself out to the public as an appraiser or performs appraisals regularly; (2) the appraiser is qualified to make appraisals of the type of property being valued;[12] (3) the appraiser is not excluded

_____

[9]Pursuant to sec. 1.170A-13(c)(3)(i)(B), Income Tax Regs., a qualified appraisal must be "prepared, signed, and dated by a qualified appraiser (within the meaning of paragraph (c)(5) of * * * [that] section)."

[10]While we recognize that "qualified appraiser" is now defined in sec. 170(f)(11)(E)(ii), that section was not in effect at the time petitioners filed the return for their 2003 tax year.  See Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(c)(1), 120 Stat. at 1084 (effective for appraisals prepared with respect to returns filed after August 17, 2006).

[11]Pursuant to sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs., a fully completed appraisal summary must be attached to the tax return on which the deduction for contribution is first claimed.  The appraisal summary, which differs from a qualified appraisal, must comply with the requirements set forth in sec. 1.170A-13(c)(4), Income Tax Regs.

[12]Pursuant to sec. 1.170A-13(c)(3)(ii)(F), Income Tax Regs., the qualified appraisal should include "[t]he qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations".  Respondent makes no claim regarding whether Mr. Ehrmann failed to report his qualifications pursuant

(continued...)

[*27] from qualifying under section 1.170A-13(c)(5)(iv), Income Tax Regs.;[13] and

(4) the appraiser understands that an intentionally false or fraudulent

overstatement of the value of the property described in the qualified appraisal or

appraisal summary may subject the appraiser to a civil penalty under section 6701

for aiding and abetting an understatement of tax liability.  According to the plain

language of the regulation, an appraiser is a qualified appraiser if he or she makes

the requisite declaration that he or she is qualified to appraise the value of the

contributed property; the regulation does not direct the Commissioner to analyze

the appraiser's qualifications to determine whether he or she has sufficient

education, experience, or other characteristics.  We conclude that the analysis of

the Court of Appeals for the Second Circuit in Scheidelman II regarding the

method and specific basis of valuation of a qualified appraisal applies equally to

the appraiser's qualification for purposes of section 1.170A-13(c)(5)(i)(B), Income

_____

[12](...continued)
to sec. 1.170A-13(c)(3)(ii)(F), Income Tax Regs., so we do not further address that issue.

[13]Pursuant to sec. 1.170A-13(c)(5)(iv), Income Tax Regs., an individual is not a qualified appraiser if the individual is, inter alia, the donor, the donee, any person employed by the donor or donee, or an appraiser who is regularly used by the donor or donee and who does not perform most of his or her appraisals for other persons.  Respondent makes no claim regarding whether Mr. Ehrmann is excluded from qualifying as a qualified appraiser pursuant to sec. 1.170A-13(c)(5)(iv), Income Tax Regs., so we do not further address that issue.

[*28] Tax Regs. Accordingly we conclude that section 1.170A-13(c)(5)(i)(B), Income Tax Regs., is a reporting requirement, i.e., an appraiser is qualified if the declaration is present, regardless of whether it is "unconvincing". See Scheidelman II, 682 F.3d at 198. Accordingly, respondent's contention that Mr. Ehrmann is not a qualified appraiser is without merit.

Respondent has conceded that Mr. Ehrmann signed the appraisal summary that contains the necessary declaration. Consequently, Mr. Ehrmann is a qualified appraiser pursuant to section 1.170A-13(c)(5), Income Tax Regs., and the Ehrmann appraisal is a qualified appraisal of the value of the development rights petitioners contributed.[14]

III. Conclusion

Upon due consideration of the foregoing, we hold that petitioners are entitled to summary judgment on the issue of whether the Ehrmann appraisal is a qualified appraisal pursuant to section 1.170A-13(c)(3), Income Tax Regs., with respect to both the facade easement and the development rights. Consequently, we reconsider our holding in our prior case that petitioners are not entitled to a

---

[14]However, we note that we do not at this time opine on whether Mr. Ehrmann's qualifications are sufficient to qualify as an expert witness to testify in this Court regarding the value of the development rights in this case or whether the Ehrmann appraisal may be admitted as an expert report pursuant to Rule 143(g) for that purpose.

**[*29]** charitable contribution deduction with respect to the facade easement. However, the other holdings of our prior opinion remain.

We have considered all arguments made, and to the extent not specifically addressed herein, conclude they have been previously addressed in our prior opinion in this case or are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.